HARRY M. KEMP et al. Appellees, vs. DIVISION NO. 241,
AMALGAMATED ASSOCIATION OF STREET AND ELECTRIC
RAILWAY EMPLOYEES OF AMERICA et al. Appellants.

*Opinion filed June 21, 1912—Rehearing denied October 2, 1912.*

1. LABOR UNIONS—*employee may quit service of employer unless bound by contract.* Any employee, unless bound by contract, may quit the service of his employer for any reason or for no reason, and his right to do so cannot be abridged or taken away by any act of the legislature nor is it subject to control by the courts, as it is guaranteed by the thirteenth amendment to the Federal constitution.

2. SAME—*when employee does not commit actionable wrong in procuring another's discharge.* Any employee may refuse to work with another employee who is for any reason objectionable to him, provided his refusal does not violate his contract with his employer, and he does not commit an actionable wrong against the other employee by merely notifying the employer that he will not work with such employee, even though the latter is thereupon discharged by his employer.

3. SAME—*officers of labor union act as agents for the members.* The purpose of organizing labor unions is to enable employees who become members to negotiate matters arising between them and their employers through the intermediation of officers and committees of the union, and if duly authorized by the employees to adjust a controversy between them and their employer, the union and its officers and committees are merely acting in the matter as agents of the employees.

4. SAME—*members of a union may authorize officers to notify employer of their demands.* No contract rights being involved, members of a labor union have the legal right to inform their employer that they will quit his employ, singly or in a body, if certain employees who are objectionable to them are not discharged, and they may authorize the officers of the union to communicate such information to the employer, and the officers in so doing, and in reporting the result of the conference, commit no actionable wrong.

5. SAME—*when employees cannot enjoin calling of a strike.* Non-union employees cannot maintain a bill to enjoin the officers of a labor union from calling a strike in accordance with a previous vote of the members of the union, not bound by contract, who are co-employees of the complainants, even though the purpose of the strike is to compel complainants to join the union or be dis-

charged from their employment, and the bill alleges that complainants will be irreparably injured if discharged and that the defendants are financially unable to respond in damages.

CARTER, J., specially concurring.

CARTWRIGHT, J., DUNN, C. J., and HAND, J., dissenting.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. CHARLES M. WALKER, Judge, presiding.

LOWES & RICHARDS, (SAMUEL ALSCHULER, of counsel,) for appellants.

GEORGE L. TURNBULL, (CARNAHAN, ELSDON & SLUSSER, of counsel,) for appellees.

Mr. JUSTICE COOKE delivered the opinion of the court:

The circuit court of Cook county sustained a demurrer interposed by appellants to a bill for injunction filed by appellees and entered a decree dismissing the bill for want of equity. Appellees prosecuted an appeal to the Appellate Court for the First District and the cause was assigned to the branch of that court. For the ·purpose of having· a final judgment in the Appellate Court, appellants, by stipulation, elected to stand by their demurrer, and the court reversed the decree and remanded the cause to the circuit court, with directions to overrule the demurrer and enter a decree in accordance with the prayer of the bill. The Appellate Court granted a certificate of importance, and appellants have prosecuted an appeal to this court.

The bill was filed by eight employees of the Chicago Railways Company against Division 241 of the Amalgamated Association of Street and Electric Railway Employees of America, a corporation, and the officers and the members of the executive board of Division 241. Its purpose was to obtain an injunction restraining the appellants,

their agents, servants and attorneys, from attempting to procure, by means of threats, the discharge of the appellees from the service of the Chicago Railways Company because of the fact that the appellees are not members of said Division 241.] While the bill contains numerous general allegations charging appellants with a conspiracy to cause the dismissal and discharge of appellees from the service of the Chicago Railways Company by means of threats, coercion and intimidation, and alleges that all the acts of appellants detailed in the bill were in furtherance of such conspiracy, the only facts disclosed by the bill are the following:

On May 8, 1908, when the bill was filed herein, appellees were, and had been for many years, employees of the Chicago Railways Company and its predecessors. After entering such service they joined, as members, Division 241 of the Amalgamated Association of Street and Electric Railway Employees of America, an organization composed of certain of the employees of the Chicago Railways Company. At the time the appellees became members of Division 241 the dues and assessments were fixed by the by-laws at fifty cents per month and seventy-five cents every three months, but were afterwards increased to seventy-five cents per month. When this bill was filed there had been collected as dues and assessments from the members since the organization of Division 241 about $190,000, of which there remained in the treasury only about $5000, the balance having been expended, in part, for purposes objectionable to appellees, especially the sum of $1200 which was expended, over appellees' objection, in support of a democratic mayoralty campaign, in which the principal issue was the question of municipal ownership of street railways in the city of Chicago. Appellees having become dissatisfied with the expenditure of the funds of the association and having concluded that their membership in the organization had ceased to be a benefit to them, tendered their resignations as members of Division 241, to take effect on the first

day of February, 1908, and from and after that date ceased to be members of the organization. Thereafter the appellant officers and members of the executive board of Division 241 caused to be appointed a committee from the members of the association for the purpose of causing the discharge and dismissal of appellees from the service of the Railways Company. The members of this committee called upon John M. Roach, an officer of the Railways Company who had power and authority to discharge appellees, and demanded that appellees be discharged from the service of the Railways Company, and gave as a reason for their demand that the appellees had ceased to be members of Division 241 and had refused to pay the dues assessed against them, and the members of the committee threatened that unless their demands were complied with and appellees discharged from the service of the Railways Company, the members of Division 241 would call a strike of the employees of the Railways Company. The Railways Company offered to submit to arbitration the question of the discharge of appellees, but the committee refused the offer. The committee reported to the appellant officers and members of the executive board of Division 241 the result of the meeting with Roach and the demands made upon the Railways Company, and thereupon the appellant officers and members of the executive board called a meeting of some of the members of Division 241 and passed a resolution to the effect that unless the appellees should be dismissed from the service of the Railways Company, the officers and members of the executive board, together with the members of Division 241, would call a strike of the employees of the Railways Company. Thereafter appellants caused a vote to be taken by the members of Division 241 on the question, "Shall we cease to work with men who after receiving benefits through our organization refuse to continue members?" The result of the vote was that the question was carried in the affirmative by an overwhelming majority. Subse-

quently the committee above mentioned attempted to arrange a meeting with Roach for the purpose of discussing the question of the discharge of appellees, but it does not appear that any such arrangement has been perfected or any meeting had. Appellees have always been in good standing as employees of the Railways Company, and there is perfect harmony between them, as such employees, and the Railways Company, and there is no cause or reason for their discharge from the service of the Railways Company other than that they have ceased to be members of said association. They have been solicited by certain members of Division 241 to withdraw their resignations, and it is solely because of their refusal to do so that appellants have attempted to procure their discharge and dismissal from the service of the Railways Company. The bill alleges that because of the aforesaid acts of appellants, appellees fear and believe that the Railways Company will be compelled to discharge them from its service without other reason or cause than as above set forth; that the employment with the Railways Company is the sole means of appellees earning a livelihood for themselves and families; that the members, officers and executive board of Division 241, and also said Division 241, are unable to respond in adequate damages for the injuries to the appellees in the event of their discharge, and that the causing of their discharge or dismissal as employees of the Railways Company for the reasons above set forth will cause them irreparable injury.

The only reasonable conclusion to be deduced from the allegations and prayer of the bill is, that appellees by this proceeding seek to restrain the union and its officers from calling a strike of its members, the obvious purpose of the injunction sought being to prevent the union employees of the Railways Company from quitting their employment in accordance with the vote previously taken, by which those employees, as members of the union, declared that they would "cease to work with men who after receiving bene-

fits through our organization refuse to continue members,"
appellees belonging to the class of men with which the union
employees had thus declared they would no longer work.
The question presented for our determination therefore is,
whether a court of equity is authorized, upon application
by the non-union employees, to restrain the union and its
officers from calling a strike of the union employees in ac-
cordance with the vote previously taken by the union em-
ployees as members of the union, where the purpose of the
proposed strike is to compel the employer to discharge the
non-union employees who are engaged in the same class of
work.   In order to decide this question in the affirmative it
would be necessary to hold that had the threatened act been
completed, appellees would have been entitled to maintain an
action for damages against the union and its officers for
accomplishing their discharge from the service of the Rail-
ways Company, and that such action at law would not af-
ford an adequate remedy because of the financial inability
of appellants to respond in adequate damages for the in-
juries which appellees would suffer by reason of their dis-
charge.   The inadequacy of the remedy at law sufficiently
appears from the bill, and it will only be necessary to de-
termine whether the appellees would have been entitled to
maintain the action for damages had their discharge been
accomplished by appellants.

That appellees would sustain damages if discharged by
the Railways Company, and that such discharge and conse-
quent damages would be occasioned by the acts of the ap-
pellants, acting for and on behalf of the union employees,
clearly appears from the bill.   The mere fact that one per-
son sustains damage by reason of some act of another is
not, however, sufficient to render the latter liable to an
action by the former for such damage, but it must further
appear that the act which occasioned the damage was a
wrongful act and not one performed in the exercise of a
legal right, otherwise it is *damnum absque injuria.*   In

Cooley on Torts, at page 81, it is said: "It is *damnum absque injuria*, also, if through the lawful and proper exercise by one man of his own rights a damage results to another, even though he might have anticipated the result and avoided it. That which it is right and lawful for one man to do cannot furnish the foundation for an action in favor of another. Nor can the absence of commendable motive on the part of the party exercising his rights be the legal substitute or equivalent for the thing amiss, which is one of the necessary elements of a wrong." Again, on page 688 of the same work it is said: "What was said in the opening chapter of the work, that the exercise by one man of his legal right cannot be a legal wrong to another, has been abundantly shown to be justified by the authorities, even if it were not, in itself, a mere truism. * * * To state the point in a few words: whatever one has a right to do another can have no right to complain of."

Every employee has a right to protection in his employment from the wrongful and malicious interference of another resulting in damage to the employee, but if such interference is but the consequence of the exercise of some legal right by another it is not wrongful, and cannot, therefore, be made the basis for an action to recover the consequent damages. It is the right of every workman, for any reason which may seem sufficient to him, or for no reason, to quit the service of another, unless bound by contract. This right cannot be abridged or taken away by any act of the legislature, nor is it subject to any control by the courts, it being guaranteed to every person under the jurisdiction of our government by the thirteenth amendment to the Federal constitution, which declares that involuntary servitude, except as a punishment for crime, shall not exist within the United States or any place subject to their jurisdiction. Incident to this constitutional right is the right of every workman to refuse to work with any co-employee who is for any reason objectionable to him, provided his refusal does

not violate his contract with his employer; and there is no more foundation for the contention that the employee commits an actionable wrong by informing the employer, before he leaves the service, that he will not work with the objectionable co-employee, and thereby occasioning his discharge, than there would be for the contention that the employee would commit an actionable wrong by quitting the service and afterward stating to the employer his reason therefor, if as a result thereof the employer should choose to discharge the objectionable co-employee. In either case the employee is exercising a legal right, and although it results in damage to the objectionable co-employee, the latter has no cause of action against the former for causing his discharge. In the case at bar, had the union employees, as individuals and without any pre-arranged concert of action, each informed the Railways Company that they would no longer work with appellees because appellees were not members of the union, and had appellees, in consequence thereof, been discharged because the Railways Company chose to retain the services of the union employees, appellees would have had no cause of action against the union employees for thus causing their discharge. Does the fact that the union, its officers and committees, acted as an intermediary between the union employees and the Railways Company, and under the circumstances and for the purposes disclosed by the bill, render unlawful the action by it or them which would have been lawful if performed by the union employees individually?

Labor unions have long since been recognized by the courts of this country as a legitimate part of the industrial system of this nation. The ultimate purpose of such organizations is, through combination, to advance the interests of the members by obtaining for them adequate compensation for their labor, and it has been frequently decided by the American courts that the fact that this purpose is sought to be obtained through combination or concerted action of em-

ployees does not render the means unlawful. In *Franklin Union* v. *People,* 220 Ill. 355, we said: "It will be readily conceded by all that labor has the right to organize as well as capital, and that the members of Franklin Union No. 4 [being a labor union] had the same legal right to organize said union as the members of the Chicago Typothetæ [being an association of employers] had to form that association, and that the members of Franklin Union No. 4 had the legal right to quit the employment, either singly or in a body, of the members of said association, with or without cause, if they saw fit, without rendering themselves amenable to the charge of conspiracy, and that the courts would not have been authorized to enjoin them from so doing even though their leaving the employment of the members of the association involved a breach of a contract." Again, in *Wilson* v. *Hey,* 232 Ill. 389, we said: "The right of laboring people to organize for the purpose of promoting their common welfare by lawful means is fully recognized."

The purpose of organizing labor unions is to enable those employees who become members to negotiate matters arising between them and their employers through the intermediation of officers and committees of the union and to accomplish their ends through concerted action. If duly authorized by the employees to adjust any controversy arising between them and their employer, the union, its officers and committees are merely acting as agents of the employees in the matter. If the union employees had the legal right to inform their employer of their refusal to work with appellees, they had the legal right to convey that information to the employer through an agent or agents, and the agent or agents would not commit an actionable wrong thereby nor by reporting back to the union employees the result of the conference with the employer. The demand that appellees be discharged, and the threat that unless the Railways Company complied with the demand the members of the union would call a strike of the employees of the Railways Com-

pany, in effect meant no more than the mere statement that the union employees of the Railways Company would no longer work with the non-union employees, and if the Railways Company chose to retain in its employ the non-union men the union employees would quit the service of the Railways Company.

A strike is "the act of a party of workmen employed by the same master in stopping work all together at a preconcerted time, and refusing to continue until higher wages or shorter time, or some other concession, is granted to them by the employer." (Black's Law Dict.) It is "a combined effort of workmen to obtain higher wages or other concessions from their employers by stopping work at a preconcerted time." (Bouvier's Law Dict.) The threat made by the committee that the members of the union would call a strike of the employees of the Railways Company unless their demands were complied with, meant no more than that the union employees would be notified to quit work in a body at a definite time if the non-union employees were retained in the service. This action of the committee, if not then authorized, was ratified by an almost unanimous vote of the union employees, and the union employees thereby authorized and instructed the union, its officers and members, to call the strike which it is sought by this proceeding to prevent. The contemplated action of the union employees is not the result of the dictation of any officer or officers of the union or of any person not interested in the employment, but is the voluntary action of the union employees of the Railways Company. The threatened act of the union and its members is therefore, in effect, the act of the union employees themselves, and if those employees have the right to perform the act by concerted action and for the purposes alleged, their authorized agents commit no actionable wrong in the performance thereof.

As has been pointed out, had the union employees, as individuals and without pre-arrangement, each informed

the Railways Company that they would no longer work
with appellees, and had the employer voluntarily chosen to
discharge appellees rather than lose the services of the un-
ion employees, they would have no cause of action against
the union employees.  No contract rights being involved,
the union employees had a right to quit the service of the
Railways Company, either singly or in a body, for any rea-
son they chose or for no reason at all.  If the only purpose
of the union employees was to quit the service and perma-
nently sever their connections with their employer, appel-
lees would in nowise be damaged and could have no grounds
for injunctive relief.  The bill discloses, however, that this
was not the only purpose of the members of the union.
They did not propose absolutely to sever their connection
with their employer, but by means of a strike to withdraw
temporarily their services, and then, by such means as might
be proper and permissible, seek to induce their employer to
accede to their demands and re-instate them in the service
under the conditions they sought to impose.  By thus com-
bining it becomes necessary to inquire whether the purpose
of the combination was a lawful one.

Ordinarily it is true that what one individual may right-
fully do he may do in combination with others.  In some
jurisdictions the question of the purpose or motive in such
cases as this is not inquired into.  But in other jurisdic-
tions the opposite view is held, for the very apparent reason
that acts done by a combination of individuals may be made
much more potent and effective than the same acts done by
an individual, and we believe the greater weight of author-
ity to be, that what one individual may lawfully do a com-
bination of individuals has the same right to do, provided
they have no unlawful purpose in view.  Would the calling
of a strike, and the inducing of an employer thereby to
accede to the demands of the union employees and to dis-
charge appellees under the circumstances disclosed, be such

an interference with the rights of appellees as to be wrongful and malicious?

It has been comparatively but a short time since it was unlawful for workmen to associate themselves together under such organizations as are now known as trades unions, for the purpose of improving the conditions of labor. Such an organization was formerly held to be a criminal conspiracy, and it required statutory enactment in England to permit workmen legally to combine for the purpose of maintaining satisfactory wages and for mutual protection. The right of labor to organize, and to strike, if necessary, without resort to violence or other unlawful conduct, for the betterment of the condition of labor, is now generally recognized by the courts of this country. As was said in *Iron Molders' Union* v. *Allis-Chalmers Co.* 166 Fed. Rep. 45: "To organize for the purpose of securing improvement in the terms and condition of labor, and to quit work and to threaten to quit work as a means of compelling or attempting to compel employers to accede to their demands for better terms and conditions, are rights of workmen so well and so thoroughly established in law, (*Thomas* v. *Railroad Co.* 62 Fed. Rep. 803; *Arthur* v. *Oakes,* 63 id. 320; *Wabash Railroad Co.* v. *Hannahan,* 121 id. 563;) that nothing remains except to determine in successive cases, as they arise, whether the means used in the endeavor to make the strike effective are lawful or unlawful."

While it cannot be successfully contended that every strike is lawful, it is generally conceded by our courts that workmen may quit in a body, or strike, in order to maintain wages, secure advancement in wages, procure shorter hours of employment or attain any other legitimate object. An agreement by a combination of individuals to strike or quit work for the purpose of advancing their own interests or the interests of the union of which they are members, and not having for its primary object the purpose of injuring others in their business or employment, is lawful. As

to whether the object which this bill discloses was sought to be attained by the members of the union was a lawful one or a valid justification of the threat to strike, the authorities in this country are clearly in conflict. Among the cases in other jurisdictions upon which appellees rely in support of their contentions on this point are *Berry* v. *Donovan*, 188 Mass. 353, *Erdman* v. *Mitchell*, 207 Pa. 79, *Lucke* v. *Clothing Cutters*, 77 Md. 396, *Plant* v. *Woods*, 176 Mass. 492, and *Curran* v. *Galen*, 152 N. Y. 33. That some of the cases cited by appellees support their contention cannot be denied. A contrary result has been reached, however, by the courts of some of the other States. This precise question has never been passed upon in this State, and were the position of appellees to be sustained it would be a long step in advance of any decision of this court. In the unsettled condition of the law on this question we are not disposed to follow the cases cited by appellees. We are of the opinion that the cases holding the contrary view are supported by the better reasoning.

It does not follow from a consideration of all the material allegations of the bill that the primary object of the union employees, or of the union officers in carrying out the wishes of the members, was to injure appellees. Neither can it be said that any actual malice has been disclosed toward the appellees or an intent to commit a wrongful or harmful act against them. No threats are made and no violence is threatened. The members of the union have simply said to their employer that they will not longer work with men who are not members of their organization, and that they will withdraw from their employment and use such proper means as they may to secure employment under the desired conditions. While this is not a combination on the part of the union employees to maintain their present scale of wages, to secure an advance in the rate of wages or to procure shorter hours of employment, all of which have been universally held to be proper and lawful objects

255 — 15

of a strike, it cannot be said that this is not a demand for better conditions and a legitimate object for them to seek to attain by means of a strike.

It is insisted that a strike is lawful only in a case of direct competition, and as it cannot be said that the union employees are in any sense competing with appellees, their acts cannot be justified. It is true, as has been stated, that the proposed strike was not to be called for the direct purpose of securing better wages or shorter hours or to prevent a reduction of wages, any one of which would have been a proper object. The motive was more remote than that, but it was kindred to it. The purpose was to strengthen and preserve the organization itself. Without organization the workmen would be utterly unable to make a successful effort to maintain or increase their wages or to enforce such demands as have been held to be proper. The following view expressed by Mr. Chief Justice Holmes in his dissenting opinion in *Plant* v. *Woods, supra,* in discussing facts similar to those here involved, is in our opinion a correct statement of the law and is applicable here: "That purpose was not directly concerned with wages. It was one degree more remote. The immediate object and motive was to strengthen the defendants' society as a preliminary and means to enable it to make a better fight on questions of wages or other matters of clashing interests. I differ from my brethren in thinking that the threats were as lawful for this preliminary purpose as for the final one to which strengthening the union was a means. I think that unity of organization is necessary to make the contest of labor effectual, and that societies of laborers lawfully may employ in their preparation the means which they might use in the final contest."

If it is proper for workmen to organize themselves into such combinations as labor unions, it must necessarily follow that it is proper for them to adopt any proper means to preserve that organization. If the securing of the closed

shop is deemed by the members of a labor union of the utmost importance and necessary for the preservation of their organization, through which, alone, they have been enabled to secure better wages and better working conditions, and if to secure that is the primary object of the threat to strike, even though in the successful prosecution of the object of the combination injury may result incidentally to non-union men through the loss of their positions, that object does not become unlawful. It is apparent that in this case the sole purpose was to insure employment by the Railways Company of union men, only. The appellees had the right to retain their membership in the union or not, as they saw fit. On the other hand, if the members of the union honestly believed that it was to their best interests to be engaged in the same employment with union men only, and that it was a detriment and a menace to their organization to associate in the same employment with non-members, it was their right to inform the common employer that they would withdraw from its service and strike unless members of the union, only, were employed, even though an acquiescence in their demands would incidentally result in the loss of employment on the part of the non-union men. It was only incumbent upon them to act in a peaceful and lawful manner in carrying out their plans.) In passing upon this question the court, in *Jersey City Printing Co.* v. *Cassidy,* 63 N. J. Eq. 759, say: "Union workmen who inform their employer that they will strike if he refuses to discharge all non-union workmen in his employ are acting within their absolute right, and, in fact, are merely dictating the terms upon which they will be employed." This case was approved in *Booth Bros.* v. *Burgess,* 72 N. J. Eq. 181. These cases hold that motive is not to be considered, and that the settled American doctrine, apart from all recent statutes, is, that all dealers in the market, whether in merchandise or in labor, on every side of the market, have an absolute right to combine voluntarily to concurrently exercise their sev-

eral rights to refrain from contracting if they see fit to do so, and that if this is not good law, then the right to refrain from contracting is subject to a most extraordinary limitation, which leads to absurd results. The Supreme Court of Minnesota has said: "The authorities, as already noted, very generally hold that a strike is not unlawful; that members of labor unions may singly or in a body quit the service of their employer, and for the purpose of strengthening their association may persuade and induce others in the same occupation to join their union, and as a means to that end refuse to allow their members to work in places where non-union labor is employed." *Gray* v. *Building Trades Council,* 91 Minn. 171.

The question here involved was discussed in *National Protective Ass'n* v. *Cumming,* 170 N. Y. 315. Mr. Chief Justice Parker, in delivering the opinion of the majority, assumed the following, as stated by Justice Vann in a dissenting opinion, to be correct principles of law: "It is not the duty of one man to work for another unless he has agreed to, and if he has so agreed, but for no fixed period, either may end the contract whenever he chooses. The one may work or refuse to work at will, and the other may hire or discharge at will. The terms of employment are subject to mutual agreement, without let or hindrance from anyone. If the terms do not suit or the employer does not please, the right to quit is absolute and no one may demand a reason therefor. Whatever one may do alone he may do in combination with others, provided they have no unlawful object in view. Mere numbers do not ordinarily affect the quality of the act. Workingmen have the right to organize for the purpose of securing higher wages, shorter hours of labor or improving their relations with their employers. They have the right to strike,—that is, to cease working in a body by pre-arrangement until a grievance is redressed,—provided the object is not to gratify malice or inflict injury upon others but to secure better terms of em-

ployment for themselves. A peaceable and orderly strike, not to harm others but to improve their own condition, is not a violation of law." Continuing, the opinion of the majority says: "Stated in other words, the propositions quoted recognize the right of one man to refuse to work for another on any ground that he may regard as sufficient, and the employer has no right to demand a reason for it. But there is, I take it, no legal objection to the employee's giving a reason, if he has one, and the fact that the reason given is that he refuses to work with another who is not a member of his organization, whether stated to his employer or not, does not affect his right to stop work; nor does it give a cause of action to the workman to whom he objects, because the employer sees fit to discharge the man objected to rather than lose the services of the objector. The same rule applies to a body of men, who, having organized for purposes deemed beneficial to themselves, refuse to work. Their reasons may seem inadequate to others, but if it seems to be in their interest, as members of an organization, to refuse longer to work, it is their legal right to stop. The reason may no more be demanded, as a right, of the organization than of an individual, but if they elect to state the reason, their right to stop work is not cut off because the reason seems inadequate or selfish to the employer or to organized society. And if the conduct of the members of an organization is legal in itself, it does not become illegal because the organization directs one of its members to state the reason for its conduct.  *  *  *  The object of such an organization is to benefit all its members, and it is their right to strike, if need be, in order to secure any lawful benefit to the several members of the organization, as, for instance, to secure the re-employment of a member they regard as having been improperly discharged, and to secure from an employer of a number of them employment for other members of their organization who may be out of employment, although the effect will be to cause the dis-

charge of other employees who are not members. * * *
Having the right to insist that plaintiff's men be discharged
and defendant's men put in their place if the services of
the other members of the organization were to be retained,
they also had the right to threaten that none of their men
would stay unless their members could have all the work
there was to do. * * * Members of the organization
refused to work any longer, as they lawfully might. They
threatened to strike, which was also within their lawful
right, but without any suggestion whatever in the findings
that they threatened an illegal or unlawful act."

In *Gillespie* v. *People,* 188 Ill. 176, a statute making it
a misdemeanor for an employer to prevent an employee, by
threats, from joining a labor organization, or to discharge
an employee because of membership in a labor organization,
was held to be unconstitutional, and the right of an em-
ployer to discharge his employee solely because he would
not resign from his union was upheld. That employees
might suffer by remaining members of their unions, or that
they might through necessity be compelled to disband the
organizations they had built up and maintained for their
own proper benefit, could not affect the right of the em-
ployer. He has the right to manage his business as he sees
fit. It would seem that labor organizations should be ac-
corded the same right to manage their affairs and to deter-
mine what is best for their own interests. To deny them
the right to determine whether their best interests required
that they should be associated in their work only with mem-
bers of their organization would imperil their very exist-
ence. If they have the right to make such a requirement,
then when their employer procures non-union labor they
have the right to strike to enforce that requirement, as that
is the only peaceable method available to compel an adjust-
ment of their controversies and to preserve the integrity of
their organizations. From the facts as disclosed by the bill
it can only be said that the members of the union, upon de-

liberation, concluded that their own welfare and business interests required that they cease working with those who were not members of their organization. This being their primary object, they have the right to quit the employment and go upon a strike and to use all proper means to secure their re-instatement upon the conditions desired.

Appellees place great reliance upon the case of *London Guarantee Co.* v. *Horn,* 206 Ill. 493, in support of their contention that their discharge under the circumstances disclosed by the bill would have entitled them to maintain a suit for damages against appellants. That the author of the opinion in that case did not regard it as authority in support of any such contention as is made here is evident from his dissenting opinion in *Barnes* v. *Typographical Union,* 232 Ill. 424, where the opinion in the *Horn case* is discussed. Horn was injured while engaged in the performance of his duties as an employee of Arnold, Schwinn & Co. The company carried an indemnity policy in the London Guarantee and Accident Company which covered the liability, if any, of Arnold, Schwinn & Co. to Horn for the injuries to the extent of $5000. The policy contained a provision giving the guarantee company the right to cancel the policy at any time upon giving five days' previous notice of its intention so to do. The guarantee company attempted to effect a settlement with Horn, but the latter rejected the offers made him and brought suit against his employer. While this suit was pending a representative of the guarantee company offered Horn $100 in settlement of his claim, and told him that unless he accepted that amount he would have him discharged by Arnold, Schwinn & Co. Horn refused this offer, and thereupon the guarantee company, through its agent, made demand upon Arnold, Schwinn & Co. that Horn be discharged, and made the following threat: "If you don't discharge him I will have to cancel this policy to-day. I am here to bring this case to a focus to-day, and if you refuse to lay him off I will can-

cel it; that's my orders." Because of this threat Horn was discharged and recovered judgment against the guarantee company for damages occasioned by his discharge, which judgment was affirmed by this court. The decision in the case was not concurred in by all the members of this court, but so far as is disclosed by the two opinions filed there was no dissension among the members as to the legal principles involved. Both opinions recognized the rule that an employee is entitled to protection in his employment from the wrongful and malicious interference of another. The dissension appears to have been occasioned by the different views entertained by the members of the court as to the meaning of the threat made by the guarantee company. The majority opinion, holding that the threat was to cancel the policy "to-day," contains the following: "When Mr. Robinett made this threat, which resulted in the appellee's discharge, he was making a threat to do an unlawful thing,—to do a thing which appellant, by the terms of the contract, had no right to do. The contract provided only for its cancellation upon five days' notice. It is not pretended that any such notice had been given, but Robinett secured Horn's discharge by threatening to cancel the contract 'to-day.' We think it perfectly apparent that the attorney for appellant, and its agent, Robinett, each sought to bring about, and finally did bring about, the discharge of the appellee by threatening to do acts which each, respectively, knew he had no right to do." The dissenting opinion, holding that the language used by Robinett should be construed to be a threat to cancel the policy in accordance with its terms, contained the following: "By the express terms of the policy issued by the appellant to Arnold, Schwinn & Co., insuring that company against liability for personal injuries to its employees, the appellant had the absolute legal right to terminate the insurance at five days' notice, in which case the unearned premium was to be repaid. That right was unconditional and could be exercised

by the appellant at its will, with or without a reason, or from any motive which might prompt it to such action. The cause, and only cause, of the discharge of the appellee was the threat of the appellant's agent, Robinett, to exercise the right reserved in the policy and cancel it unless the appellee should be discharged. We see no justification for saying that the threat was to cancel the policy in any different way from that provided in it. Having an absolute legal right to cancel the policy at its own election, the threat of appellant to do it was not a threat to do a legal wrong. If there was a legal right to cancel the policy it was not unlawful to declare an intention to do so, and if the right was not affected by the reasons influencing appellant's action, the motive was immaterial." The vital distinction between the *Horn case,* as treated in the majority opinion, and this case is, that in the former the employee was discharged because of a threat to do a wrongful act, while in the case at bar, had appellees been discharged, it would have been because of the threat by appellants to do an act which they had a right to do, and the case would then be governed by the principles announced in the dissenting opinion in the former case.

Appellees also rely upon *O'Brien* v. *People,* 216 Ill. 354, *Franklin Union* v. *People,* 220 id. 355, and *Barnes* v. *Typographical Union,* 232 id. 424. In the *O'Brien case* and the *Franklin Union case* practically the same questions were involved. In each of those cases the employees had gone out on strike and injunctions had been secured restraining the unions, their officers and others from committing certain wrongful acts. The injunctions in each instance were violated and those guilty of the violations were prosecuted. While the matters involved in each case grew out of acts following a strike of union employees, the question of the right to strike was not involved in either case. What was said in the *O'Brien case* relative to the demand made upon the Kellogg company to sign an agreement binding it to

employ only members of the union, and its refusal to sign such an agreement, was not necessary to a determination of the matters involved. It was not an issue in that case and had no bearing whatever upon whether the defendants there had committed such acts of violence as should be enjoined or had violated the injunction. The same is true of the *Franklin Union case,* and the quotation in that case from the *O'Brien case* was not necessary to a determination of the questions there involved. In each of those cases unlawful acts of violence had been committed and an injunction had been issued restraining such acts, which was in full force and effect. The only questions involved in those cases was whether or not the injunction had been violated and what punishment should be inflicted. The *Barnes case* was a bill for injunction to restrain the defendants from interfering with the business of the complainants or with their employees and from picketing complainants' premises. The injunction sought was against acts similar to those enjoined in the *O'Brien case* and the *Franklin Union case,* and when read in the light of the facts it is not in point and is in no manner decisive of the questions here presented.

The cases of *Doremus* v. *Hennessy,* 176 Ill. 608, and *Wilson* v. *Hey,* 232 id. 389, also relied upon by appellees, and the case of *Purington* v. *Hinchliff,* 219 id. 159, were all boycott cases. The courts are practically unanimous in holding that the acts done and proposed to be done in each of those cases are unlawful, for the reason that they are done with a wrongful motive and for the immediate purpose of inflicting an injury upon another. What was said in those cases applies only to the existence of a boycott or of a threat to boycott. This case partakes of none of the elements of a boycott. The primary object of a boycott being to inflict injury upon another, has universally been held to be illegal. Here the primary object of the combination is to further the interests of the organization and

improve and better the condition of its members. What-
ever injury may follow to others is merely incidental.

The judgment of the Appellate Court is reversed and
the decree of the circuit court is affirmed.

*Judgment reversed.*

Mr. JUSTICE CARTER, specially concurring:

I concur in the final conclusion but not in all the rea-
soning of the foregoing opinion. The questions involved
are of such far reaching importance that I deem it proper
to set out my views at length, even though in so doing I
may repeat some of the things that are stated in the opin-
ion of Mr. Justice Cooke. On the precise question raised
in this case neither decisions nor text books are in accord.
A brief review of the history of the law regarding labor
disputes will aid in reaching a correct solution of the ques-
tions at issue.

The laws controlling organizations and combinations of
labor and capital have gradually changed with the passing
centuries. The law of evolution has applied to these mat-
ters as elsewhere. (1 Eddy on Combinations, sec. 210.)
Competition in trade and business has usually been thought
desirable, and while unrestrained competition has often led
to most serious wrongs to the individual, ordinarily it has
been considered that the benefits of free competition to
society outweighed the disadvantages to individuals. To
so adjust matters as to preserve the principle of competi-
tion and yet guard against its unnecessary abuse has been
a growing problem in recent years. (*Tuttle* v. *Buck,* 107
Minn. 145.) In the last half century the changes in ma-
chinery and in social conditions generally have not only
greatly affected economic theories, but have required many
changes in the law so as to conform to altered social needs.
New statutes have been enacted, but, independent of any
statute, the courts have gradually adapted the fundamental
principles of the law to changing conditions. The early

English statutes contained severe restrictions as to organizations among laborers working together to further their own interests. Less than two centuries ago it was held by the English courts to be a criminal conspiracy at common law for two or more persons to combine for the purpose of obtaining higher wages. (*Rex* v. *Journeymen Tailors*, 8 Mod. 10; *Rex* v. *Mawbey*, 6 T. R. 619; Martin on Modern Law of Labor Unions, 3.) In the early part of the last century the courts of New York, basing their holdings on *Rex* v. *Journeymen Tailors, supra,* decided that combinations of workmen to raise wages were unlawful. (*People* v. *Melvin,* 2 Wheeler's Crim. Cases, 202; *People* v. *Fisher,* 14 Wend. 9; see, also, *Commonwealth* v. *Carlile,* Brightley, 36.) The current of authority, however, has changed, and later statutes and decisions have conceded that members of labor unions may lawfully act together in their own interests. A recent English statute has gone to the extent of providing that an agreement or combination of two or more persons in furtherance of a trade dispute is not actionable unless such acts would be so without such agreement or combination. (British Trade Dispute Act of 1906, L. R. Gen. Stat. 44, [1906] p. 246.) Regardless of statutes, the courts in this country have long since agreed that workmen have the right to organize for the purpose of promoting the conditions of labor.

The lawful limits to which competition may go, either in trade or in the employment of labor, have not been clearly settled. We are, as it were, "in the twilight zone" of the law on these questions. Such rights are relative—not absolute. They are subject to certain limitations. The right of persons to trade is conditioned upon the like right of other persons. The right of an employer to hire employees is subject to the rights of laborers to hinder by lawful methods. (*Willcutt & Sons Co.* v. *Bricklayers' Union,* 85 N. E. Rep. [Mass.] 897; *Giblan* v. *National Amalgamated Laborers' Union,* 2 K. B. Div. [1903] 600.)

Every person has the right, under the law, to dispose of his own labor or manage his capital according to his own will, but he must exercise this right so as to make it compatible with the exercise of similar rights by others. (Erle on Trade Unions, 12.) The legal right of every person is conditioned on the welfare of society, and the latter is more important than the welfare of any individual or class. In practical matters there are frequently competitive, conflicting rights. It has been said that an important feature of the law is the adjustment of such rights, and that often the best that can be done is to effect a "rough compromise beween them." Dicey on Law and Opinion in England, Appendix, 466; 20 Harvard Law Rev. 360.

Within a comparatively recent period the doctrine has been developed that a person is liable for knowingly inducing another to break his contract with a third person, although it is still argued by some that this doctrine violates the fundamental maxim that only the proximate, and not the remote, cause of an injury should be considered by the law,—that the legal remedy against the party breaking the contract is ample. (Cooke on Combinations,—2d ed.—sec. 27.) The first case squarely laying down this rule was *Lumley* v. *Gye,* 2 Ell. & Bl. 216, decided in 1853. (See *Ashby* v. *White,* 1 Smith's· L. C.—11th ed.—240, and note 291; *Vicars* v. *Wilcocks,* 2 id. 521, and note.) That such person is liable is now, however, the settled rule of law, and this doctrine has been applied to trade disputes unless otherwise provided by statute. *Angle* v. *C., St. P., M. & O. Ry. Co.* 151 U. S. 1; *Reynolds* v. *Davis,* 84 N. E. Rep. (Mass.) 457; see, also, *Allen* v. *Flood,* App. Cas. (1898) 1; *Bowen* v. *Hall,* 50 L. J. Rep. (N. S.) 305.

The authorities are not in accord as to whether the motive with which an act is performed can affect the legality. It has been stated that an act which does not amount to a legal injury cannot be actionable because done with a bad intent. (2 Cooley on Torts,—3d ed.—1503.)

It is clear that there are cases in which wrongful motive has no legal significance. · For example, where the plaintiff refuses to leave defendant's house when requested and is forcibly ejected by the defendant; it makes no difference, under such circumstances, that the defendant is gratifying a vindictive spirit in so doing. Again, public interests require that neither judge, jurors, parties nor counsel shall be called to account for words spoken while acting in those capacities. (*Spalding* v. *Vilas,* 161 U. S. 483.) There is a contrariety of decisions as to the liability of the owner of land using it not to benefit himself but solely to the detriment of his neighbor, such as sinking a well for the mere purpose of draining a neighbor's spring, or the erection of a "spite fence." In many jurisdictions these acts are held tortious. (18 Harvard Law Rev. 414, and cases cited.) In recent cases as to gas ·and oil wells the reckless waste of material without benefit to the waster has been restrained. (*Manufacturers' Gas Co.* v. *Indiana Natural Gas Co.* 155 Ind. 461; *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190; *Hague* v. *Wheeler,* 157 Pa. St. 324.) Lord Holt held that a person had a right to shoot on his own ground if he had any real occasion so to do, but to shoot on purpose to damage another was wrong. (*Keeble* v. *Hickeringill,* 11 East, 574.) To put poisoned food on one's own land to kill an offensive animal would give no cause of action to a neighbor whose dog might die from eating it, but such an action might arise if the person putting out the poison knew that the neighbor's dog was in the habit of coming upon the premises and put it there to kill the dog. (*Cobb* v. *Cater,* 38 S. E. Rep. [S. C.] 114.) The majority of the judges in *Allen* v. *Flood,* App. Cas. (1898) 1, held that an act in itself lawful was not converted by a malicious or bad motive into an unlawful act. In *Commonwealth* v. *Hunt,* 45 Mass. 111, one of the earliest cases in this country which discussed this question, (Chief Justice Shaw writing the opinion,) it was held that

the liability of a labor combination might depend upon the means used for the accomplishment of its purpose; that it would not be improper for the members to agree together to exercise their own acknowledged rights in such a manner as to best subserve their own interests; that a class of workmen might be impressed with the evils of intemperance and agree not to work in a shop where liquor was furnished or with anyone who used it, or not to work for an employer who should, after notice, employ such workman. The very recent case of *Tuttle* v. *Buck, supra,* is a good example of motive affecting the liability. In that case the defendant, a banker and a man of influence in the community, maliciously established a barber shop and employed a barber to carry on the business and used his personal influence to attract customers from the plaintiff's shop, not to serve any legitimate purpose of his own, but for the sole purpose of maliciously injuring the plaintiff. This was rightly held an actionable tort. The lawfulness of the act which causes damage may depend on whether it is for a justifiable cause, and its justification may be found "sometimes in the circumstances under which it is done, irrespective of motive, sometimes in the motive alone, and sometimes in the circumstances and motive combined." (*Plant* v. *Woods,* 176 Mass. 492.) "The dictum that our law never regards motive as an element in a civil wrong is as far from the truth as would be the statement that malevolently to damage another is always a tort. The truth lies in the middle. In certain cases, in spite of the wrongful motive of the actor, malevolently to damage another is lawful, either because the act is merely the exercise of an absolute legal right or because it is justified by paramount considerations of public policy. Except in such cases, however, willfully to damage another by a positive act and from a spirit of malevolence is a tort, even though the same act, if induced by a rightful motive, would be lawful." (18 Harvard Law Rev. 411, 422, and cases cited.

See, also, 6 Pomeroy's Eq. Jur. sec. 597; *Thomas* v. *C., N. O. & T. P. Ry. Co.* 62 Fed. Rep. 803; *Moran* v. *Dunphy,* 177 Mass. 485; Martin on Modern Law of Labor Unions, sec. 35.) While this court has never, in terms, discussed this question as to labor disputes, it is plainly intimated in *London Guarantee Co.* v. *Horn,* 206 Ill. 493, that motive might affect the liability, for it was there stated that if an employee was inefficient, untrustworthy, dishonest or dissolute, that would be lawful justification for other employees refusing to work with him. The weight of authority in this country, as well as sound reason, is to the effect that motive may determine the question of liability.

In discussing the question of motive the decisions frequently say that if an act is done with a malicious motive the actor will be liable. The word "malice" is not always used with the same meaning, especially in civil proceedings. (20 Harvard Law Rev. 255; *Allen* v. *Flood, supra,* p. 25.) The term "malice," in ordinary usage, means ill-will against a person, but in a legal sense it means a wrongful act done intentionally, without just cause or excuse. (*London Guarantee Co.* v. *Horn, supra; Allen* v. *Flood, supra,* p. 18.) This latter definition governs in this class of cases. The intentional infliction of damage is a tort out of which an action may arise unless there is just cause for inflicting the damage. (*Aikens* v. *Wisconsin,* 195 U. S. 194; *Allis-Chalmers Co.* v. *Iron Moulders' Union,* 150 Fed. Rep. 155; Pollock on Torts,—7th ed.—21; 20 Harvard Law Rev. 262, note; Bishop on Non-Contract Law, sec. 19.) This was also the rule at common law. (*Glamorgan Coal Co.* v. *South Wales Mining Federation,* 2 K. B. [1903] 545; 22 Law Quarterly Rev. 118.) The great weight of authority is in accord as to these fundamental principles. The difficulty, especially in labor disputes, arises in applying them, in order to decide whether there was just cause for inflicting the damage.

It is difficult to conceive of a strike without damage to the parties involved in the dispute. The employees intend to deprive the employers of their labor and prevent them from getting others to take their places. They intentionally inflict harm as a means of compelling the employers to yield to their demands. The American and English authorities now all agree that employees have the same right as employers to combine for the legitimate advancement of their interests; that for the purpose of advancing the legitimate interests of the members of a labor union, and not for the purpose of oppressing or injuring others, they may strike or threaten to strike. This may be done to secure a raise in wages, shorter hours, better sanitary conditions, or any other lawful purpose the primary object of which is to benefit themselves. (1 Eddy on Combinations, sec. 521; 1 Martin on Modern Law of Labor Unions, 13; *Arthur* v. *Oakes,* 63 Fed. Rep. 310; *Iron Moulders' Union* v. *Allis-Chalmers Co.* 166 Fed. Rep. 45; *Karges Furniture Co.* v. *Amalgamated Woodworkers,* 6 Ann. Cas. [Ind.] 829.) And this principle is enforced even though, as a natural incident thereto, damage is inflicted upon the employer. To strike or threaten to strike will be illegal if it embraces within its scheme violence, intimidation or other illegal or wrongful methods. Often there is the strongest kind of intimidation without actual violence. Intimidation includes not only a threat of bodily harm, but also serious annoyance and damage. (*Quinn* v. *Leathem,* App. Cas. [1901] 495.) Persuasion and entreaty may be used in such a way and with such surroundings as to constitute intimidation. *Goldfield Consolidated Mines Co.* v. *Goldfield Miners' Union,* 155 Fed. Rep. 500; 18 Harvard Law Rev. 427.

Members of a union knowingly inflicting harm upon their employer or a fellow-employee, even as a means of benefiting themselves, should be held liable unless the harm comes from what may be called a truly competitive act.

255 — 16

The authorities do not all agree as to what may fairly be held to be within trade or competition. Competition in business is generally permitted though it is selfish and frequently disastrous to those engaging in it. (*Martell* v. *White,* 185 Mass. 255.) The dispute must be in reference to demands that are real and substantial, relate to the employment and affect the direct and immediate interests of the persons involved. The damage resulting to the employer or the general public must not be unreasonable as compared with the benefits to the workmen. The rights of the employer and employees, as has been said, are relative and not absolute. Every absolute right has its limits, and to that extent it is the correlative duty of every person to respect and refrain from obstructing, by force, fraud, intimidation or other unlawful means, another person's rights. (*Karges Furniture Co.* v. *Amalgamated Woodworkers, supra.*) The right to dispose of one's labor as he will is incident to the freedom of the individual. "Such a right can lawfully be interfered with only by one who is acting in the exercise of an equal or superior right which comes in conflict with the other. An intentional interference with such a right, without lawful justification, is malicious in law, even if it is from good motives and without express malice." (*Berry* v. *Donovan,* 188 Mass. 353.) Acts directed against certain parties, primarily for the purpose of doing them harm, do not come within the limits of lawful competition. (*Barnes* v. *Typographical Union,* 232 Ill. 424. See, also, as bearing on this subject, 20 Harvard Law Rev. 361; *Allen* v. *Flood, supra,* pp. 23, 37, 98, 167; *Quinn* v. *Leathem, supra,* pp. 512, 528; *Mogul Steamship Co.* v. *McGregor-Gow Co.* App. Cas. [1892] 25; *Brennan* v. *United Hatters,* 65 Atl. Rep. [N. J.] 165; *Pickett* v. *Walsh,* 192 Mass. 572.) On these questions of the management and control, as well as the rights, of great combinations of capital and labor, the rights of the public "as a distinct entity" must be considered. (Bigelow on Cen-

tralization and the Law, 7; 20 Harvard Law Rev. 436.) Individual liberty must be subject to such restraint as the public interests may require, and when the two conflict the former must yield. *Adair* v. *United States,* 13 Ann. Cas. 764, and note; 208 U. S. 161.

The argument is sometimes made that to trades unionists the non-unionists are necessarily rivals competing in the same labor market, and therefore a strike (whether sympathetic or otherwise) to prevent the non-union workmen from working is always within the meaning of a trade dispute. . I cannot yield assent to this argument, though this seems to be the construction that must almost necessarily be put upon the present English Trades act, passed in 1906. By the weight of authority and in accord with sound public policy a sympathetic strike or a boycott must be held unlawful, as not within the immediate field of competition. Persons who have nothing to do with the trade dispute—non-combatants—cannot be compelled, by such means, to take part in the struggle. A "boycott," as that term is ordinarily used, and a sympathetic strike, are attacks upon society itself. They are only justified when revolution is justified. Neither labor nor capital can be organized for such a purpose. "The starvation of a nation cannot be a lawful purpose of a combination, and it is utterly immaterial whether the purpose is effected by means usually lawful or otherwise." *Thomas* v. *C., N. O. & T. P. Ry. Co. supra,* p. 821.

Many argue that what one person may lawfully do any number of persons by concerted action may also lawfully do. As a practical matter this is not always true. "It is plain that a strike by a combination of persons has a power of coercion which an individual does not have. The result of this greater power of coercion on the part of a combination of individuals is, that what is lawful for an individual is not the test of what is lawful for a combination of individuals." (*Pickett* v. *Walsh, supra.*) One man, it is true,

because of his leadership in labor circles or his large capital, might commit and be liable for the same damage as a body of men acting in concert. Generally speaking, however, the individual may be left to take his chances in the struggle with another individual, but when the struggle is between a combination and an individual the latter's chance to succeed is small. An individual is usually at liberty to walk peaceably and quietly through the crowded street of a city and continue to do it day in and day out, but a crowd acting in unison, whether in line or in a mass, could not continuously do this, because they would seriously interfere with other people's rights on the street. In my opinion the weight of authority is to the effect, as has been held by this court, that a combination may be liable for the performance of an act which if done by an individual would not be unlawful. *Franklin Union* v. *People,* 220 Ill. 355; *Willcutt & Sons Co.* v. *Bricklayers' Union, supra.* See, also, *Temperton* v. *Russell,* 1 Q. B. Div. [1893] 435; *Quinn* v. *Leathem, supra,* pp. 503, 537; *Mogul Steamship Co.* v. *McGregor-Gow Co. supra,* p. 38; 18 Law Quarterly Rev. 2; *Giblan* v. *National Amalgamated Laborers' Union, supra; Gompers* v. *Buck Stove Co.* 221 U. S. 418.

In this case there is no question of violence, intimidation, unlawful coercion, threats or other unlawful methods, unless it can be said that a threat to strike if non-union men are not discharged is intimidation, as that term is used in this class of cases. The courts of Massachusetts have held that a strike for purposes similar to those shown in the allegations of the bill in this case was not lawful; that the officers and members of a labor union would be held in an action of tort for inducing an employer to discharge a workman because he did not belong to the union, (*Plant* v. *Woods, supra; Berry* v. *Donovan,* 188 Mass. 353;) and that such a strike could be enjoined. (*Folsom* v. *Lewis,* 94 N. E. Rep. [Mass.] 316.) In other jurisdictions in this country the same general rule has been

laid down as followed in Massachusetts. (See *Erdman* v. *Mitchell*, 207 Pa. St. 79; *Purvis* v. *United Brotherhood*, 214 Pa. St. 348; *Lucke* v. *Clothing Cutters*, 77 Md. 396; *Brennan* v. *United Hatters*, *supra; Perkins* v. *Pendleton*, 90 Me. 166; *Everett-Waddey Co.* v. *Richmond Typographical Union*, 105 Va. 188; *Beck* v. *Teamsters' Protective Union*, 118 Mich. 497; 1 Eddy on Combinations, sec. 517.) Some of these cases do not strictly bear on the question here under discussion. In *Erdman* v. *Mitchell*, *supra*, the injunction issued was sustained on the ground, among others, that it was sought by the defendants to prevent the complainant from securing employment "with any other employer whatsoever." In *Lucke* v. *Clothing Cutters*, *supra*, certain non-union employees sought admission to the union and were refused without any apparent reason. That case and *Beck* v. *Teamsters' Union*, *supra*, also involved violence. In *Plant* v. *Woods*, *supra*, there was a contest between two rival labor unions of the same craft; at the time the threat was made to strike if certain persons were not discharged, it was intimated also that the employer, if he refused, "might expect trouble in his business." The opinion held that this last statement meant more than that the strikers would cease to work.

Other courts have upheld the contention of appellants on the question under consideration. In *National Protective Ass'n* v. *Cumming*, 170 N. Y. 315, it was held that a labor union might refuse to permit its members to work with fellow-servants who were members of a rival organization, and might notify the employers to that effect and that a strike would be ordered unless such fellow-servants were discharged; that even though the employers objected to the discharge, neither they nor the organization of which they were members would have a right of action against the labor union or its members. In *Gray* v. *Building Trades Council*, 91 Minn. 171, the court stated that the authorities very generally held that the members of a labor union may,

singly or in a body, quit the services of their employer, and for the purpose of strengthening their association may persuade and induce others in the same occupation to join their union, and as a means to that end may refuse to allow their members to work in places where non-union labor is employed. In *Jersey City Printing Co.* v. *Cassidy,* 63 N. J. Eq. 759, the court said (p. 762) : "Union workmen who inform their employer that they will strike if he refuses to discharge all non-union workmen in his employ are acting within their absolute right, and, in fact, are merely dictating the terms upon which they will be employed." The reasoning in this case was approved in *Booth Bros.* v. *Burgess,* 72 N. J. Eq. 181. To the same effect is *Allis-Chalmers Co.* v. *Iron Moulders' Union,* 150 Fed. Rep. 155. (18 Am. & Eng. Ency. of Law,—2d ed.—84; see, also, *Clothing Co.* v. *Watson,* 168 Mo. 133; Cooke on Combinations, sec. 60; *State* v. *VanPelt,* 136 N. C. 633; *Parkinson* v. *Building Trades Council,* 154 Cal. 581; 18 Law Quarterly Rev. 1.) The only recent English cases in point are those decided previous to the Trades Dispute act of 1906. The conclusions reached by the various judges in *Mogul Steamship Co.* v. *McGregor-Gow Co. supra, Temperton* v. *Russell, supra, Allen* v. *Flood, supra,* and *Quinn* v. *Leathem, supra,* are not in accord, but the reasoning of the majority of the judges in all these cases tends to support the conclusions of appellants herein rather than those of appellees. The United States Supreme Court has not decided the question now before us, but the reasoning of the Federal courts of intermediate and appellate jurisdiction in the cases heretofore cited tends strongly to support the contentions of appellants. See for a review of the authorities and principles involved, *Iron Moulders' Union* v. *Allis-Chalmers Co.* 166 Fed. Rep. 45.

This court has never decided this precise question. In *Doremus* v. *Hennessy,* 176 Ill. 608, we had occasion to discuss the principles now under consideration, and held

that the members of a labor union had no right to insist that another person unite with them or fix his scale of prices the same as that of the union, or make his refusal a pretext to break up his business by inducing his customers to break their contracts and stop dealing with ·him.  On petition for rehearing an additional opinion was handed down.  It is clear from this that the turning point of the decision was that the members of the union had caused the violation of existing contracts, which were property rights in the plaintiff.  In *London Guarantee Co.* v. *Horn, supra,* many of the authorities heretofore reviewed were considered.  In that case Horn was in the employ of Arnold, Schwinn & Co. under a contract terminable by either party at any time, but under which the employment would have continued for an indefinite period had not the London Guarantee Company caused Arnold, Schwinn & Co. to ·discharge him for the purpose of compelling him to release a cause of action which he claimed, and for the satisfaction of which, if it existed, the guarantee company was liable up to $5000.  The court stated that the injury sought to be visited upon Horn was not primarily the deprivation of his employment, but was to compel him to surrender a right not connected with ·his employment; ·that while competition in trade, employment or business (using the term in its ordinary meaning) may be a sufficient justification, in law, for procuring the discharge of another from employment, the mere fact that a person procuring the ·discharge has a temporary or pecuniary interest to be served by the act is no such justification, but said (p. 502) : "If the only object of appellant had been to secure appellee's discharge for the purpose of obtaining his position for another, or for the reason that the employment of appellee by Arnold, Schwinn & Co. in some way conflicted with the right of appellant, or some organization to which it belonged, to obtain the same or similar employment, a very different question, and one not now before this court, would

be presented." The dissenting opinion insisted that that case was not different, in principle, from the cases where one in the exercise of a legal right "refuses to continue in the employment of another unless some other employee shall be discharged." *Gibson* v. *Fidelity and Casualty Co.* 232 Ill. 49, lays down the same doctrine as that laid down in the case just cited. There are some expressions in *O'Brien* v. *People,* 216 Ill. 354, which tend to uphold the contentions of appellees herein,—expressions quoted with approval in some later cases,—but in those cases the question now before this court was not necessary to the decision.

It would be difficult, if not impossible, to formulate a general rule to determine in what cases a justification for damage would exist, and even if formulated such a rule would be almost impossible of enforcement. (*Glamorgan Coal Co.* v. *South Wales Mining Federation, supra,* p. 577; *Giblan* v. *Amalgamated Laborers' Union, supra,* p. 516; *Martell* v. *White, supra,* p. 258.) The rights of individuals are necessarily controlled by the welfare of society, and therefore the decision of these cases must depend, not upon arbitrary rules, but upon the peculiar and special facts in each case. The difference in decisions on this question is often only one of degree, as "most differences are, when nicely analyzed." *Rideout* v. *Knox,* 148 Mass. 368.

As heretofore stated, the highest court of Massachusetts has upheld the contention of appellees, but in the early case of *Commonwealth* v. *Hunt, supra,* it appeared from the pleadings that the defendants and others had formed themselves into a society and agreed not to work for any person who should employ any journeyman or other person not a member of such society, after notice given to him to discharge such employee. The decision stated, on page 129: "The manifest intent of the association is to induce all those engaged in the same occupation to become members of it. Such a purpose is not unlawful." That court has also made rulings on kindred questions which tend quite

strongly to uphold the conclusion reached in *National Protective Ass'n* v. *Cumming, supra.* In *Pickett* v. *Walsh, supra,* it was held that a strike by the members of a bricklayers' and stonemasons' union in refusing to lay bricks or stone in the construction of a certain building unless also employed to do the pointing of the mortar and unless other persons not bricklayers or stonemasons were discharged, did not entitle the latter persons, when discharged by the contractor, to maintain a suit in equity to enjoin the acts of the members of the union. In *Minasian* v. *Osborne,* 96 N. E. Rep. (Mass.) 1036, decided in November, 1911, the court held that where the labor union substantially controlled the labor market in the manufacture of shoes, and ordered a strike on the refusal of an employer to discharge an employee or compel the latter to cease employing his father as a helper, the father sustaining substantial injury as a result of the acts of the union, such union would not be restrained, by injunction, from demanding the latter's discharge. The facts on the hearing in that case showed that the labor union complained of the system used by the employee and his father, because they claimed it resulted in an unequal distribution of labor in slack times, and thus affected the wages of the strikers, though it did not affect the wages during busy times.

To hold that a labor organization has a right to strike because the members want the work other people are doing, and cannot be enjoined for so striking, does not seem to differ very materially, in principle, from holding that a labor organization can strike because certain fellow-laborers will not join the union. The result of the latter strike, if successful, will be to give the work of the non-union men to the union men. It would appear, also, to be drawing a very fine distinction to hold that the primary object of a strike in such a case, as shown in *Minasian* v. *Osborne, supra,* was to aid the members of the labor union, while in

the case now under consideration the primary object was not to help the members.

We are dealing here with one of the great and pressing problems of our complex civilization. The decision of many of these questions is difficult, and on the special facts of a given case some courts might place certain strikes on one side of the legal line and some on the other. The law, in its modern development, undertakes to insure to the employer not only that he may employ as he pleases, but that all he may wish to employ may freely enter into and remain in such employment without unreasonable molestation, by words or acts, from others, acting singly or in a combination. On the other hand, for the purpose of maintaining or increasing the value of their capacity to labor, laborers, whether singly or in combination, should have like free access to the labor market. The restraints of the law should apply equally to both parties. (6 Pomeroy's Eq. Jur. 598; *Iron Moulders' Union* v. *Allis-Chalmers Co.* 166 Fed. Rep. 45.) In *Gillespie* v. *People,* 188 Ill. 176, it was held that the employer had the undoubted right, at will, to discharge a man because he was a member of a union, and that a statute to make such discharge punishable was unconstitutional. A similar provision was held unconstitutional in *Adair* v. *United States,* 208 U. S. 161, where the court said, on page 175: "It was the legal right of the defendant, Adair, (however unwise such course might have been,) to discharge Coppage because of his being a member of a labor organization, as it was the legal right of Coppage, if he saw fit to do so, (however unwise such a course on his part might have been,) to quit the service in which he was engaged because the defendant employed some persons who were not members of labor organizations. In all such particulars the employer and the employee have equality of right, and any legislation that disturbs that equality is an arbitrary interference with the liberty of contract, which no government can legally justify in a free land." It is

difficult to see any distinction, in principle, between the questions involved in these cases and those in the case we are here deciding.

The law concerning the right to labor or cease to labor for an employer applies to a single person or a combination of persons. If the members of a labor organization do not wish to work for the same employer with one or more other persons, they certainly have the right, under all authorities, to quit peaceably. Shall the courts hold employees liable in an action for damages because they refuse, on account of religious or race questions, to work with other employees? Religious or race prejudice might be held to be based on arbitrary whim or caprice, without any reasonable basis of benefit to the competing workmen. The most that has ever been said by the courts in support of the contention of appellees is, that the refusal to work with non-union men, while it might strengthen the labor organization, was a result too remote from the controversy between the employer and employees to be considered such a direct benefit to the latter as to justify a strike on that account. Here we have co-equal rights in conflict,—the right of certain persons to be free to remain in their employment without interference, and the right of the members of the labor union to quit their employment for good cause or no cause at all. In the majority of cases the primary purpose of the strike is not to injure the non-union workmen but to benefit organized labor. (18 Harvard Law Rev. 418, note 3.) Clearly, in this case the strike was not malevolent,—that is, on account of ill-feeling toward the non-union workmen as individuals or primarily from a desire to injure them,—because the union workmen requested and demanded that the non-union workmen, who had formerly belonged to the union, be required to join the union or else be discharged.

While it is sometimes argued that there may be a right to strike when, under certain circumstances, a threat to

strike would be unlawful, (20 Harvard Law Rev. 268,) on reason and authority the members of a labor organization have the legal right peaceably to threaten to do that which they may lawfully do. *National Protective Ass'n* v. *Cumming, supra; National Fireproofing Co.* v. *Mason Builders,* 169 Fed. Rep. 259; *Park & Sons Co.* v. *National Druggists' Ass'n,* 175 N. Y. 1.

In my judgment union workmen not bound by contract who inform their employer that they will strike unless he discharge non-union workmen in the same line of employment should be held to be merely dictating the terms of their own employment; that it is not unlawful for members of a labor union to seek by peaceful methods to induce those engaged in the same occupation to become members of such union, and as a means to that end to refuse to allow union laborers to work in the same line of employment in a place where non-union laborers are employed. The proposed purpose of the strike not being unlawful it necessarily follows that an injunction should not issue as prayed for in the bill.

There is a further reason why the judgment of the Appellate Court should not be sustained. If it were conceded that under the allegations of the bill the purpose of the proposed strike was unlawful and appellants would be liable in a civil action for damages if as a result of their threat to strike, or of striking, the appellees were discharged and thereby damaged, still the law would not authorize an injunction restraining the members of the labor union from striking, as that would be, in effect, to compel them to continue in their employer's service unwillingly. The injunction in strike and boycott cases is of very recent use. (*Jersey City Printing Co.* v. *Cassidy,* 63 N. J. Eq. 759; *Vegelahn* v. *Guntner,* 167 Mass. 92; 6 Pomeroy's Eq. Jur. sec. 586.) So long as workingmen continue in the employ of an employer, public interests may, under certain circumstances, require that they be compelled to perform the

proper duties of their position. (6 Pomeroy's Eq. Jur. sec. 618.) Even though the workmen are doing an unlawful act by quitting the service of their employer and damage is thereby inflicted, the weight of authority is to the effect that employees will not be enjoined from withdrawing peaceably from such service, either singly or in a body, notwithstanding such withdrawal involves a breach of contract. (*Franklin Union* v. *People, supra; Arthur* v. *Oakes,* 63 Fed. Rep. 310; *Hopkins* v. *Oxley Stave Co.* 83 id. 913; *Wabash Railroad Co.* v. *Hannahan,* 121 id. 563; *Barnes & Co.* v. *Berry,* 156 id. 72; *D., L. & W. R. R. Co.* v. *Switchmen's Union,* 158 id. 541; 18 Am. & Eng. Ency. of Law,—2d ed.—92, and cases cited; Martin on Modern Law of Labor Unions, secs. 52-56; Cooke on Combinations, sec. 98.) In *Arthur* v. *Oakes, supra,* Justice Harlan, in discussing this subject, said (p. 318): "The rule, we think, is without exception that equity will not compel the actual affirmative performance by an employee of merely personal services, any more than it will compel an employer to retain in his personal service one who, no matter for what cause, is not acceptable to him for service of that character. The right of an employee engaged to perform personal service to quit that service rests upon the same basis as the right of his employer to discharge him from further personal service. If the quitting in the one case or the discharging in the other is in violation of the contract between the parties, the one injured by the breach has his action for damages, and a court of equity will not, indirectly or negatively, by means of an injunction restraining the violation of the contract, compel the affirmative performance from day to day or the affirmative acceptance of merely personal services. Relief of that character has always been regarded as impracticable." In discussing this question in *Boyer* v. *Western Union Telegraph Co.* 124 Fed. Rep. 246, the court, after stating that the complaint did not allege that there were any contract relations between the plaintiffs and the de-

fendant company to retain the plaintiffs in their service for any given period, continued (p. 249) : "But if there were, then it must be said that it was illegal to discharge them. Yet in that event equity can give no relief. The remedy is at law for a breach of contract, and each man injured must sue separately and in his own right for damages sustained. It would be intolerable if a man could be compelled by a court of equity to serve another against his will, or if a man could be compelled to retain in his employ one he does not want. Courts of equity exercise no such power and grant no such relief." In *Toledo, A., A. & N. M. Co.* v. *Pennsylvania Co.* 54 Fed. Rep. 730, the opinion, after discussing at length the principles controlling in labor contests, said (p. 743) : "No matter how inadequate the remedy at law, the arm of a court of equity cannot be extended, by mandatory injunction, to compel the enforcement of personal service as against either the employer or the employed. (Citing cases.) The reason is obvious. It would be impracticable to enforce the relation of master and servant against the will of either."

The suggestion has been made that this is not an injunction to compel employees to remain in the employ of the Railways Company, but rather to restrain the officers of a labor union from causing the discharge of non-union workmen by threatening to call a strike. According to well settled principles of law, members of labor unions "have the right to appoint officers who shall advise them as to the course to be taken by them in their relations with their employer." (*Thomas* v. *C., N. O. & T. P. Ry. Co. supra.*) This right should not be denied or restricted where it is shown, as in this case, that the members of the labor union have voted to strike, and that under the constitution and by-laws of the union no strike can be declared without the sanction of the officers. To enjoin them from calling a strike under these circumstances would be, in substance and effect, an injunction against resort to a strike by employ-

ees who are members of the order. Clearly, the prayer for this injunction is an attempt to compel the affirmative performance by employees of the Railways Company of personal services for said company. As was said by Justice Harlan in *Arthur* v. *Oakes, supra,* on page 319: "The fact that employees of railroads may quit under circumstances that would show bad faith upon their part, or a reckless disregard of their contract or of the convenience and interests of both employer and the public, does not justify a departure from the general rule that equity will not compel the actual, affirmative performance of merely personal services, or, which is the same thing, require employees, against their will, to remain in the personal service of their employer." This court has never held otherwise. *Doremus* v. *Hennessy, supra, London Guarantee Co.* v. *Horn, supra,* and *Gibson* v. *Fidelity and Casualty Co. supra,* were all actions on the case to recover damages. *O'Brien* v. *People, supra,* and *Franklin Union* v. *People, supra,* were injunction cases, but the chief questions in those cases were violence and intimidation and not the right of employees to quit, and in the last named case it was stated that the courts would not be authorized to enjoin employees from quitting, even though such action involved a breach of contract.

The argument is made that the result of such a holding is to deprive appellees, innocent third parties, of a means of gaining a living, and they will thus suffer irreparable injury, because, as a practical question, they cannot recover from appellants in an action at law. Every strike deprives innocent third parties of a means of earning a livelihood as long as the strike is in progress. Certainly no one in this day would argue that all strikes, no matter what their purpose, should be enjoined because innocent third parties are thereby injured.

To permit injunctions restraining employees from quitting peaceably their employment under the circumstances shown here would be contrary to the weight of authority

and against wise public policy. If, before or after the members of a labor union cease work, they should attempt, by violence, threats of violence or by any other unlawful methods used against either the employees or employer, to compel other employees to quit the service of their employer, then a different situation would be presented.

CARTWRIGHT, J., DUNN, C. J., and HAND, J.: We do not understand that the views of three justices as expressed in the opinion of Mr. Justice Cooke nor our own opinion as to the legal questions involved in this case establishes the law of the State, but that the concurrence of a fourth justice in the conclusion that the judgment of the Appellate Court shall be reversed and the decree of the circuit court affirmed disposes of this case. The result thus reached is contrary to the law of this State, as we understand it, declared in repeated decisions covering a period of fourteen years. This court expounds and declares the law of this State, and, having done so, it is not necessary, and we do not regard it as proper, to resort to the decisions of a few other States for the purpose of establishing different rules. There ought to be stability in the law and the decisions of the courts, and the settled law ought not to be overturned because of dissenting opinions which did not express the views of the court or because decisions of other courts of a contrary nature may be found.

The opinion of Mr. Justice Cooke fairly and correctly states that the question in this case is whether a court of equity is authorized to restrain a labor union and its officers from calling a strike for the purpose of compelling the employer to discharge non-union employees; that in order to decide the question in the affirmative it is necessary to hold that had the threatened act been completed appellees would have been entitled to maintain an action for damages against the union and its officers for accomplishing their discharge, and that such action at law would not af-

ford an adequate remedy because of the financial inability of appellants to respond in adequate damages for the injuries which appellees would suffer by reason of their discharge. It is conceded that the inadequacy of the remedy at law appears from the bill, and if the appellees would have been entitled to maintain an action for damages in case the appellants had succeeded in causing their discharge, they were entitled to an injunction to prevent the threatened injury. It was essential to a correct conclusion that the issue thus clearly and correctly defined should not be lost sight of or confused with other questions, but, as appears to us, both of these things happened. The opinion lays down the correct doctrine that every employee has a right to protection in his employment from the wrongful and malicious interference of another resulting in damage, but asserts that the threatened act in this case would not be unlawful because an employee not bound by contract to his employer may leave the service at his own will, and what one may do all may do in combination. On the ground that in such a case the employer cannot complain that any right he possesses has been infringed, it is said that to cause the discharge of appellees by a threat of a strike is the exercise of a legal right which cannot be a wrong to anyone. The rights and duties of employer and employee, or their relations to each other, have no connection with this case. The right asserted by appellees to be free from interference by appellants is not a right which inheres in the Railways Company and the question whether a strike would be a wrong to it is not involved. The bill is based on the ground that there would be no strike but that the appellees would be discharged. There is no reason to suppose that the threat would not be effective, and the question here is whether the appellants can be permitted to drive the appellees out of employment because they do not choose to belong to the union and contribute to a political party or other purposes of which they do not approve.

255 — 17

Leaving out of view other questions eliminates much of the. reasoning and most of the authorities on which the judgment in this case is based.

The principle involved came before this court in *Doremus* v. *Hennessy,* 176 Ill. 608, and the decision is a leading one upon that subject in the law of this country. The plaintiff was conducting a laundry office in the city of Chicago. She had no laundry of her own but employed persons operating laundries to do her work, who, when the work was done, returned the same to her and she delivered it to her customers. Her prices were not as high as those fixed by the Chicago Laundrymen's Association, and because she would not be governed by the prices fixed by that association the defendants interfered with her customers and with the laundries that did her work. She brought an action on the case against the parties interfering with her customers and her business and recovered a judgment for $6000, which was affirmed by this court. It was said (p. 614): "No persons, individually or by combination, have the right to directly or indirectly interfere with or disturb another in his lawful business or occupation, or to threaten to do so, for the sake of compelling him to do some act which, in his judgment, his own interest does not require." In that case the plaintiff had engagements with some of the laundrymen to do her work and the contracts were broken, but the damages for such breaches would not account for a judgment of $6000, and there was no intimation that evidence of the other acts was not entirely competent and ground for a recovery. The principle declared was (p. 615): "Every man has a right, under the law, as between himself and others, to full freedom in disposing of his own labor or capital according to his own will, and anyone who invades that right without lawful cause or justification commits a legal wrong, and, if followed by an injury caused in consequence thereof, the one whose right is thus invaded has a legal ground of action

for such wrong." The court recognized the doctrine that merely to persuade a person to break his contract may not be unlawful in law or in fact, and that lawful competition that may injure the business of another is not actionable unless there is actual malice, but held it actionable if persuasion is used for the malevolent purpose of injuring another, or if one from unlawful motives interferes with another's trade either by fraud or misrepresentation, or by molesting his customers or those who would be customers, or by preventing others from working for him or causing them to leave his employ, with intent to inflict injury which causes loss. There must be nothing illegal either in the object intended to be attained or in the means employed to effect it.

If it be conceded that what one may lawfully do in pursuance of a legal right two or more may lawfully agree to do jointly, and the only difference is not in principle but in the consequences which may result from doing the act in combination, certainly no one can deny that if such an act as was threatened in this case could not lawfully be done by an individual it could not be done by a combination of numerous individuals constituting Division 241. The only difference would be that a single individual could not accomplish the injury, while a combination of 4500 employees would be certain to procure the discharge of appellees.

The question whether an individual can lawfully, for his own gain, procure the discharge of another from his employment was settled by this court in *London Guarantee Co.* v. *Horn,* 206 Ill. 493, in accordance with the principles declared in *Doremus* v. *Hennessy, supra.* There is no possible ground of distinction between the rights which a corporation, within its chartered powers, may exercise and those enjoyed by individuals, and it was there held that such an act as was threatened in this case by the appellants is a wrongful and unlawful act, which will authorize a recovery of damages. Horn was in the employ of Arnold,

Schwinn & Co., and while so employed was injured and brought an action against his employers to recover for his injury. Arnold, Schwinn & Co. carried an indemnity policy in the London Guarantee and Accident Company. After a time Horn resumed work for Arnold, Schwinn & Co., when the guarantee company made an offer of settlement of Horn's claim for his injury, which offer was declined, whereupon demand upon Arnold, Schwinn & Co. to discharge Horn was made by the guarantee company, and that company threatened to cancel the guarantee bond held by Arnold, Schwinn & Co. if Horn was not discharged. There was an absolute contract right reserved in the policy to cancel it. The relations between Horn and his employers were satisfactory, but to avoid the cancellation of the policy Horn was discharged. He brought an action against the guarantee company for wrongfully causing his discharge and recovered and the recovery was sustained by this court. If the act of the guarantee company in the exercise of its contract right was wrongful and unlawful as an interference with the right of Horn to labor, the act of the union in this case would not be less so. It was said in that case that the clear weight of authority is to the effect that where the contract is one of employment it is immaterial whether it is for a fixed period or is one which is terminable by either party at will, both parties being willing and desiring to continue the employment under the contract for an indefinite period,—and such is the fact in this case.

The same question was considered again in *Gibson* v. *Fidelity and Casualty Co.* 232 Ill. 49, and the court followed the former decision and re-affirmed the doctrine that an individual cannot, for the purpose of obtaining an advantage to himself, procure the discharge of another where the employment is merely at will and no contract exists. It can make no difference what the nature of the benefit or advantage to the one attempting to disturb the legal right

of another may be,—whether to gain an advantage by strengthening a labor organization or obtaining relief from a money liability.

One circumstance which, under the laws of trade and business, has always been recognized as a sufficient justification for one who seeks his own advantage at the expense of another is that the parties are in direct competition, and that principle applies to laborers equally to those engaged in trade and business. The right of a laborer to sell his labor to anyone who is willing to buy it is of the same character as the right to dispose of any other species of property, and laborers may, either individually or in combination, endeavor to obtain work whatever the consequences may be to others, provided they do not use any unlawful means to accomplish the object. The facts of this case will not admit of the application of that doctrine. The only manner in which it is suggested that the appellants are in competition with appellees is, that the power and influence of labor organizations depend upon the number of their members, and the threat to procure the discharge of appellees was made for the purpose of strengthening Division 241, and thereby securing a continuance of favorable conditions as against the employer, and good wages. It is true that the power of labor organizations depends upon the proportionate number of laborers who belong to them, and if the proportion within the organizations is so small as not to have any influence the employer will disregard their demands. If all laborers belonged to such an organization they would be possessed of arbitrary power and be able to dictate terms to the employer, whether just or unjust, and accomplish results which otherwise would not be obtained. The benefits which have resulted to labor, in general, by the organizing of laborers into unions is generally acknowledged, but it is equally true that every individual laborer has a right to judge for himself whether he will belong to a labor organization or

dispose of his labor as an individual. The law has not, and ought not to have, any favorites as between those who choose to exercise their individual right and those who choose to enter into combinations, and constitutional guaranties would be futile and the courts useless if the individual cannot be protected in his rights. The right of the individual cannot be disregarded or ignored, and the fact that he is but one asserting his right against the dictation of many does not limit his right to protection. To justify an act which it is conceded will be an injury and damage to the appellees, and which will not secure better wages, shorter hours of labor or improved conditions of labor in any other respect, on the mere ground that the object is to strengthen Division 241, is to destroy every vestige of protection against interference with the right of anyone to labor who chooses to work independently. A majority may believe, as in this case, that a contribution to the campaign of a political party will strengthen the organization, and there is scarcely any limit to the things that may be so regarded.

In *London Guarantee Co.* v. *Horn, supra,* the court distinguished between competition and remote or possible benefits; and in *Barnes* v. *Typographical Union,* 232 Ill. 424, it was said that the court had rejected fanciful and far-fetched definitions of the word "competition" which would include all conflicts of temporal interest, and it gave to the word its ordinary meaning and signification. There was no attempt in this case by anyone to obtain service from the employer which might have resulted in the discharge of appellees, and if there had been, the employer would have been free to determine which to employ, but there was a mere effort to have the appellees discharged because they exercised their legal right to withdraw from Division 241. The benefits which might result to that division from the discharge of appellees are of the most gen-

eral character, and the appellants were not in any sense in competition with the appellees for labor.

The law of this State and the decisions of this court are so understood by other courts. *Berry* v. *Donovan,* 188 Mass. 353, was an action brought to recover damages sustained by reason of the defendant's malicious interference with the plaintiff's contract of employment. The defendant was the representative of a union and induced the employer of the plaintiff to discharge him on the ground that he was not a member of the union and persistently declined to join it. The court made it clear that an interference by a combination of persons to obtain the discharge of a workman because he refuses to comply with their wishes for their advantage in some matter in which he has a right to act individually is not competition; that the benefit expected in such a case is only added strength for contests with the employer, and that such an object does not justify the infliction of an intended injury upon a third person for the purpose of obtaining it. The court said that the law of this State was in accord with that conclusion, and cited *Doremus* v. *Hennessy* and *London Guarantee Co.* v. *Horn.* That has been the understanding of other courts and law writers concerning the effect of those decisions of this court.

Although the question is not here involved, this court has also expressed its views as to the right of a·labor union to demand a closed shop where the question arose between employer and laborers and no injury to others was even threatened. In *O'Brien* v. *People,* 216 Ill. 354, the court quoted at length from the opinion in *Doremus* v. *Hennessy, supra,* concerning the right of every man, under the law, to full freedom in disposing of his labor or capital according to his own will, and, referring to the refusal of the Kellogg Company to sign an agreement for a closed shop under threat of a strike, said (p. 371): "The law is well settled that every person shall be protected in the right to enter into contracts or in refusing to do so,

as he shall deem best for the advancement of his own interest, without interference by others." It cannot be objected that the question was not involved in that case, since the court said that the determination of the questions in the case involved a consideration of the facts and circumstances under which the alleged strike was ordered and the purpose which was sought to be accomplished by it. The same doctrines were reiterated in *Purington* v. *Hinchliff*, 219 Ill. 159, and *Barnes* v. *Typographical Union, supra.*

There have been a few cases adopting the view that because the simultaneous quitting or withdrawing from work of a body of workmen is not unlawful in itself as against the employer, it cannot become unlawful on account of a malicious motive to injure other workmen in the exercise of their right. The case of *Allen* v. *Flood,* App. Cas. 1, decided by the House of Lords, was generally interpreted as an example of that doctrine. It was there held that the appellant had violated no legal right of the laborers discharged, that no unlawful means were used to procure their discharge, and that appellant's conduct was not actionable, however malicious or bad the motive might have been. The decision, as originally understood, did not commend itself to courts generally, and contrary doctrines were announced in *Doremus* v. *Hennessy, supra.* The case was referred to in the additional opinion delivered by Mr. Justice Phillips on the petition for a rehearing, and it was there said that six of the eight judges whose assistance was requested by the House of Lords answered the questions propounded to the judges differently from the conclusion reached. After considering the decision this court declared complete adherence to what had been said in the original opinion. In *Moran* v. *Dunphy,* 177 Mass. 485, the court disapproved the decision in *Allen* v. *Flood,* and it was also considered unsound by the Supreme Court of Wisconsin in *State* v. *Heugin,* 85 N. W. Rep. 1046. It was there said the decision was not reached by any great weight in num-

ber, and in view of the opinions delivered, which showed
that the rule established was new in English law and over-
turned the overwhelming judicial opinion of England, very
little could be discovered in the case to warrant adopting
and extending the principle thereof to a combination to ma-
liciously injure. In *Brennan* v. *United Hatters,* 73 N. J. L.
729, the court of errors and appeals of New Jersey found
the reasoning of the judges and lords who maintained the
right of action to be more satisfactory. Substantially all
the courts which have considered questions touching the
relative rights of different laborers as between themselves,
have either directly or by necessary inference repudiated
the doctrine of *Allen* v. *Flood.* Among the cases are *Plant*
v. *Woods,* 176 Mass. 492; *Erdman* v. *Mitchell,* 207 Pa.
St. 79; *Curran* v. *Galen,* 152 N. Y. 33; *Chipley* v. *Atkin-
son,* 23 Fla. 206; *Perkins* v. *Pendleton,* 90 Me. 166; *Berry*
v. *Donovan, supra; Lucke* v. *Clothing Cutters,* 77 Md.
396; *Thatcher C. & C. Co.* v. *Burke,* 53 S. E. Rep. 161;
*Beck* v. *Teamsters' Union,* 118 Mich. 497; *Holder* v. *Can-
non Manf. Co.* 135 N. C. 392; *Blumenthal* v. *Shaw,* 77
Fed. Rep. 954; *Barr* v. *Essex Trades Council,* 53 N. J. Eq.
101; *Brown & Allen* v. *Jacobs Pharmacy Co.* 115 Ga. 429.

The decision in *Allen* v. *Flood* has been qualified, ex-
plained, and, as generally understood, has been overruled in
England. In *Quinn* v. *Leatham,* (1901) A. C. 495, its ef-
fect was explained away as being a case where there was
no combination but only an act by the defendant express-
ing his own views, and as holding that an act which does
not amount to a legal injury cannot be actionable on ac-
count of a bad motive. In *Giblan* v. *National Amalgamated
Laborers' Union,* (1903) 2 K. B. Div. 600, the secretary
of a trade union notified the foreman of plaintiff's em-
ployer that other men would be called out on a strike un-
less the plaintiff was discharged. The object was to enforce
payment of a debt due to the union, which would be an
advantage to the union and increase its resources and be

a benefit more direct and immediate than increasing membership, and it was held that the discharge of the plaintiff so procured was unlawful. The case of *National Protective Ass'n* v. *Cumming,* 170 N. Y. 315, was a contest between two rival labor organizations, one of which had been organized by a laborer who had failed to pass the examination required by the other organization. The qualifications and standard of admission of that organization were lower than those of the other, and the objection was to working with men not qualified according to the standard of the objecting organization. The court was divided, and a great deal was said in the majority opinion which had only remote connection with the question involved and which has not met with the approval of the courts or law writers generally. There is no question, here, of competency, fitness, danger to other employees, race, color, religion, or any other thing that would make association unpleasant or objectionable. The question in this case was not involved in that one, but the decision of the same court in *Curran* v. *Galen,* 152 N. Y. 33, was upon substantially the same question here in issue. That was the case of an individual laborer, and the court held that if the purpose of an organization was to coerce other workingmen to become members under the penalty of loss of employment the purpose was unlawful.

The right of every laborer to dispose of his labor as he may choose for the support of himself and those dependent upon him is as sacred as the right to carry on any lawful business or any other right of the citizen. Governments and courts would be useless if they fail to protect the laborer in the enjoyment of such a right. It can only lawfully be interfered with by one in the exercise of an equal or superior right, and that is the ground upon which the right to obtain the place of another in direct and lawful competition is sustained. The right of a labor organization to enforce a closed shop for the mere purpose of

strengthening the labor organization in future contests with the employer is not competition, and is not of the same character or equal to the right of the individual to dispose of his labor at his own will. There is not the slightest reason to suppose that the Railways Company would permit a strike to be called, with the consequent disastrous effects to its business, for the sake of retaining the appellees in its employment. They would undoubtedly be discharged, and the accomplishment of that result for the purpose of gaining the remote and indirect advantage to Division 241 would give a right of action to the appellees for the consequent damage. The case is therefore one where a court of equity ought to interpose to prevent the threatened danger, and in our opinion the judgment of the Appellate Court should be affirmed.