John Carlson, Appellant, v. Carpenter Contractors'
Association et al., Appellees.

Gen. No. 26,302.

Oscar Carlson, Appellee, v. Edward Hines Lumber
Company et al., Appellants.

Gen. No. 26,314.

1. CONSPIRACY—*sufficiency of evidence to show establishment of boycott and blacklist.* The evidence in two consolidated cases, one by a carpenter employee against a Carpenter Contractors' Association and others, and the other by one who was erecting a building against a lumber corporation and others, tended to show the establishment of a boycott and blacklist, and the establishment of a monopoly in the business of furnishing building materials in the counties in question, in violation of several provisions of Cahill's Ill. St. ch. 38, ¶ 116, providing that if any two or more persons conspire or agree together for the purpose of establishing a boycott or shall post notices with the wrongful intent to injure the person, business, etc., of another, or to do any illegal act injurious to the public trade, they shall be deemed guilty of a conspiracy, and defendants were also, at common law and independently of the statute, liable prima facie for conspiracy to injure the striking carpenters and the general public.

2. CONSPIRACY—*agreement to boycott and blacklist as agreement to do unlawful act.* The agreement of the defendants (in the actions in question to recover damages for injury sustained by an alleged conspiracy to injure the employment of plaintiff and others, and prevent the sale of lumber and other materials) to boycott and blacklist carpenters was an agreement to do an unlawful act, and the agreement to do it by bringing into existence a monopoly of the business of furnishing materials was an unlawful way of attempting to bring about and make effective the illegal thing which they intended to do.

3. CONSPIRACY—*what not defense to boycott and blacklist.* In tort by a carpenter employee against a Carpenter Contractors' Association and a Building Construction Employers' Association and others to recover damages for injury caused by an alleged conspiracy to injure plaintiff's employment and prevent the sale of lumber and other building materials, the defendants could not plead in justification the alleged violation by plaintiff of the terms of the

contract of a carpenters' union to work for a fixed price an hour, even if he was bound by the terms of such contract.

4. CONSPIRACY—*construction of "primary purpose."* The phrase "primary purpose" used in applying the rule of liability in two consolidated tort cases, one for alleged conspiracy to injure plaintiff's employment and the other for damages caused by preventing plaintiff's use of building materials, *held* to mean the principal or fixed intention with which an act or course of conduct is undertaken, and within this meaning the "primary" as distinguished from the "secondary" purpose with which defendants entered upon the plan then in contemplation, included any one of a number of things—not only the ultimate end to be accomplished, but also the acts which, according to the plan in the minds of those who agreed upon it, would be put into effect in order to obtain and realize the ultimate plan; and each one of the defendants was held to have intended all things which were the natural and probable results of the causes which they set in motion.

5. EVIDENCE—*presumption of intent.* Every responsible human being is presumed to intend the thing which is the natural and probable result of his acts; and, in law, intention is not determined by what any given individual or individuals may say was the subjective condition of their wills at a particular time, but rather is conclusively presumed from objective realities which the particular state of mind has brought about.

6. CONSPIRACY—*right of combination of dealers to select customers.* Although it is held to be the law in some States that as individual dealers in materials have a right to sell or not to sell to whomsoever they may please, it is lawful for them to do in combination what each might do separately, it seems not to be generally so held.

Appeals from the Municipal Court of Chicago; the Hon. WELLS M. COOK, Judge, presiding. Heard in this court at the October term, 1920. Reversed with judgment here. Opinion filed April 3, 1922.

HOPE THOMPSON, for appellant John Carlson and appellee Oscar Carlson; ALBERT M. KALES, of counsel.

ALBERT FINK and MUSGRAVE, OPPENHEIM & LEE, for appellees Carpenter Contractors' Association et al.; JOHN H. S. LEE, of counsel.

ADAMS, CHILDS, BOBB & WESTCOTT, for appellants and appellees Edward Hines Lumber Company et al.;

ROBERT W. CHILDS and JAMES B. WESCOTT, of counsel.

MR. JUSTICE MATCHETT delivered the opinion of the court.

These cases Nos. 26,302 and 26,314 were tried together, and have been consolidated for hearing in this court. In each case the plaintiff sued the Carpenter Contractors' Association, an unincorporated voluntary association, and certain of its officers and members, the Building Construction Employers' Association of Chicago, an unincorporated voluntary association, and certain of its officers. More than twenty corporations engaged in the business of supplying lumber and other materials for building in Cook and Lake counties, Illinois, were also made defendants in each case.

The alleged rights of action are in tort, grew out of the same transaction, and the evidence submitted in the one case was material and pertinent in the other. The propositions of law applicable are also similar.

The statements of claim allege, in substance, that on July 18, 1919, the defendants unlawfully and maliciously entered into an agreement, combination and conspiracy to injure the employment of the plaintiff and others, and in furtherance of said agreement, combination or conspiracy, conspired to prevent and did prevent the sale of lumber and other building materials in counties of Cook and Lake in the State of Illinois, intending to injure plaintiffs thereby.

In the case of Oscar Carlson it is alleged that plaintiff was at that time constructing a building for his own use, and that the completion of the same was thus delayed to his injury. In each case the defendants were by order of court excused from filing an affidavit of merits. Both causes were heard by the court without a jury. Propositions of law and of fact were submitted, upon which the court ruled, and these rulings are preserved in the record. In the case of

John Carlson there was a finding for the defendants, and judgment was entered on the finding against the plaintiff for costs. In the Oscar Carlson case there was a finding for the plaintiff, and judgment was entered for him and against defendants on the finding. In each case the defeated party perfected an appeal.

The material evidentiary facts are practically undisputed, leaving only the question of the inferences to be drawn therefrom, the legal principles by which such facts and inferences should be interpreted, and the legal obligations which arise out of the application of such legal principles to such facts and inferences. In other words, the dispute in this case, as appears both from the briefs of counsel and from frank admissions made upon oral argument, is not upon the evidentiary facts proven by the record, but upon the inferences from and the legal principles which should be applied to such facts and inferences and the legal obligations, if any, which arise therefrom. John Carlson is a journeyman carpenter and a member of the Carpenters' Union, which is affiliated with and subject to the jurisdiction of the Chicago Building and Trades Council and the American Federation of Labor. John is an employee solely. He works with his hands, and for wages by the hour. He does not furnish building materials, and he does not have any dealings with persons selling such materials. At the time of the alleged wrong he was in the employ of one Simon Hill, who was an independent contractor; that is, Simon Hill did not belong to any contractors' association.

Hill desired to continue the employment of John and John wished to continue to work for Hill. Hill had work which he desired John to do. July 19, 1919, John was discharged by his employer Hill for the reason that Hill was unable to obtain any building material. John used diligence to obtain other employment, but was unable to do so. He was unem-

ployed for nine weeks, and in that time lost in actual wages the sum of $396.

Oscar, the other plaintiff, was building a home for himself with a store on the ground floor, which was to be rented to prospective tenants. On and after July 18, 1919, he was unable to purchase any building material, although he had the money to pay for it and was willing to buy it. He was for this reason unable to continue the construction of his building, and its construction was delayed until after September 22, 1919. His actual damage by the delay was the sum of $340.

Neither plaintiffs had ever before had any controversy with any one of the defendants. The inability of John's employer and Oscar to obtain building material came about in this way: Representatives of the Carpenters' District Council, having jurisdiction of the union of which John Carlson was a member, made an agreement with the Carpenter Contractors' Association, which had not expired and would not expire for several months. Prior to July 18, 1919, a controversy arose between the Carpenters' Unions and the Contractors' Association. The carpenters demanded compensation for their work at the rate of one dollar an hour. Negotiations were opened with the Contractors' Association to that end, and it was represented that the contractors, while not bound so to do, might as a matter of fair dealing and justice, on account of the rise in the cost of living, make some concession in the way of an advance in wages, but a decision of the matter was in one way and another delayed. The carpenters in the meantime became restless, officials of the labor organizations claimed that they were unable to control their members, and finally the carpenters struck, except as to such employees and contractors as were willing to pay the wages demanded.

In response to this strike the Carpenter Contrac-

tors' Association and the Building Construction Employers' Association declared a lockout against all union workmen in the building trades throughout Cook and Lake counties. The members of these employers' associations comprised about 75 per cent of all building contractors in the City of Chicago. The members ceased, in obedience to instructions from the officials, to carry on work on their jobs. The carpenters in Cook and Lake counties were organized to the extent of practically 100 per cent of their craft. The demand for their labors was great, and many of them obtained employment from independent contractors and individuals, who paid the rate of wages demanded.

Before the lockout was declared the officers of the Contractors' Association called in the principal dealers in building materials in these two counties, and requested them to cease selling materials to any person employing or about to employ union labor in the building trades. A large meeting was afterwards called at which 80 per cent of the building contractors were present. The contractors again urged that the dealers in building materials ought to co-operate with them in order to make the lockout effective. No agreement was reached at that meeting; a third meeting was called and held on July 17, when the same request was repeated, and the materialmen replied that they would "stand with the contractors and assist in making the lockout effective by refusing to sell any material destined for use by these striking unions." The record shows that Mr. John Griffiths, one of the defendant contractors, said he "knew the materialmen were just as much interested in stabilizing the industry and clearing up the situation as he was; that they were daily losing large profits, which they would otherwise make, through the refusal of the general public to build, until the situation had been cleared up." He said he thought that if a general lockout

became necessary, the materialmen would for their own interests agree not to sell any material, where it was destined for use by union labor in the building trades, until there had been a complete adjustment of all differences; that he was heartily in favor of a general lockout; that he could see no other means of making the unions do what was right and of obtaining workable building conditions. Mr. Embree, one of the defendant materialmen, said in substance that he agreed with what Mr. Griffiths had said; that he realized that his own business had suffered largely from the uncertainty of building conditions and the consequent refusal of the public to engage in building until conditions became more stabilized. He said he was a merchant; that he bought and sold merchandise-lumber; that he laid in his stock upon the supposition that he would be able to dispose of it within a given time at a fair profit, and that prompt deliveries could be made of orders which he accepted. He said the uncertainty of building conditions was such that he could not dispose of his stock and turn his money over as he had planned, on account of the incessant, interminable, jurisdictional and sympathetic strikes. He said he realized that his concern was losing profits by reason of the demand for building material not being what it would be if building conditions were as they should be. Other representatives of the two associations spoke to the same effect. The meeting adjourned to reconvene Saturday, July 19. At that meeting it was reported that a lockout order had been sent to every member of the Building Construction Employers' Association, and that the indications were that the order was being generally obeyed. Representatives of the material interests reported that instructions had been given to their several concerns to refuse to sell any material where it was destined for use on jobs employing striking labor. But it was also represented that there would be emer-

gency cases where serious damages might be inflicted by reason of inability to procure necessary materials. Thereupon an emergency committee was appointed with the understanding that it would hold daily sessions to hear emergency cases, "determine whether an emergency in fact existed, and if such an emergency did exist, so find, and recommend that material be sold in the specific instances, notwithstanding the fact that such material might afford temporary employment for the striking unions."

From July 19, 1919, until the final determination of the controversy on September 21, there were daily conferences of the executive committee of the Building Construction Employers' Association and representatives of the various material interests. On September 21 the controversy was settled by the employers acceding to the demands of the carpenters for compensation at the rate of $1 an hour.

The defendants requested the court should find as a fact "that the primary purpose and ultimate object of the materialmen in refusing to sell material was neither to maliciously injure the plaintiffs nor to stifle competition or create a monopoly." This finding the court refused to make. Whether this ruling was proper we shall discuss later. Extended briefs and printed arguments have been filed, and the questions involved have been ably presented on oral argument by the attorneys for the respective parties.

Section 46 of chapter 38 of the Revised Statutes (Cahill's Ill. St. ch. 38, ¶ 116) provides:

"If any two or more persons conspire or agree together * * * for the purpose of establishing a so-called boycott or blacklist, or shall post or distribute any written or printed notice in any place, with the fraudulent or malicious intent wrongfully and wickedly to injure the person, character, business or employment, or property of another * * * or to do any illegal act injurious to the public

trade * * * shall be deemed guilty of a conspiracy. * * *,,

In *Purington v. Hinchliff*, 219 Ill. 159, the Supreme Court said:

"No person or combination of persons can legally, by direct or indirect means, obstruct or interfere with another in the conduct of his lawful business, and any loss wilfully caused by such interference will give the party injured a right of action for all damages sustained. All parties to a conspiracy to ruin the business of another because of his refusal to do some act against his will or judgment are liable for all overt acts illegally done pursuant to such conspiracy and for the subsequent loss, whether they were active participants or not."

To the same effect are *London Guarantee & Accident Co. v. Horn*, 206 Ill. 493; *Wilson v. Hey*, 232 Ill. 389; *Barnes & Co. v. Chicago Typographical Union*, 232 Ill. 424; *Doremus v. Hennessy*, 176 Ill. 608; and indeed we believe that such has been the sustained ruling of the Supreme Court of this State, unless it may be said that the case of *Kemp v. Division No. 241*, 255 Ill. 213, holds to the contrary.

We think the uncontradicted evidence in this case tends to show a violation by defendants of several provisions of this section of the statute. In the first place, defendants not only agreed to but did in fact succeed in establishing a boycott and blacklist against the striking carpenters. *Gompers v. Buck's Stove & Range Co.*, 221 U. S. 418. In the second place, it was the intention of the defendants to, and as against the general public they succeeded, in establishing a monopoly in the business of furnishing building materials in Cook and Lake counties. This monopoly existed for at least ten weeks.

A conspiracy is defined in *Spies v. People*, 122 Ill. 212;

"As a combination of two or more persons, by some concerted action, to accomplish some criminal or un-

lawful purpose; or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means.''

It is there pointed out that a defendant in such case may be found guilty although he did not originate the unlawful plan, if after it was originated he joins in putting it into effect.

Now, the agreement of the defendants to boycott and blacklist the carpenters was an agreement to do an unlawful act, and the agreement to do it by bringing into existence a monopoly of the business of furnishing materials for building purposes was an unlawful way of attempting to bring about and make effective the illegal thing which they intended to do.

We think, also that, at common law and independent of the statute, the defendants are on the facts liable prima facie for conspiracy to injure the striking carpenters and the general public. The provisions of our National and State Constitutions provide that no person shall be deprived of life, liberty or property without due process of law; that every person ought to find a certain remedy in the laws for all injuries and wrongs which he may receive in his person, property or reputation, and make it impossible that the law may be held to sanction conduct of this kind.

Every person in a free State has certain fundamental rights—personal liberty, personal security, and private property. Those rights were recognized and protected by the common law. An action by one person or an agreement by two or more persons without justifiable cause to injure another in these respects is a crime against the State and a tort against the individual who sustains damage therefrom.

The right of the laborer to work at whatever trade or calling he may desire, to work at such times and places as he may wish, to obtain the best price for his services which he may obtain in a free market, are

fundamental, elementary rights of every working man, either individually or collectively. So, also, the employer has correlative rights. He has the right to conduct his business in a lawful manner, without obstruction, interference or dictation from anyone; to retain or discharge his employees as he may see fit; to make necessary purchases in his business in a free and open and unobstructed market; and he has the right to obtain either labor or material upon the terms which he may deem most advantageous to himself. All these rights were recognized, protected and secured by the rules of the common law.

The trial judge was of the opinion that the rights of the plaintiff had been invaded by the defendants, and that Oscar Carlson was entitled to recover damages. The trial judge was also of the opinion that John Carlson was not, under the facts, entitled to recover. He distinguished the case of John from that of Oscar. He said:

"If John Carlson was perfectly blameless himself, and the defendants proceeded with unlawful and wrongful motives to injure him, he would, no doubt, have a cause of action against them. John Carlson was one of the journeymen carpenters, who violated the contract of the carpenters' union to work for 80 cents an hour. Under the contract, union carpenters were at liberty to work for whomsoever they saw fit; the employers were also at liberty to employ and discharge whomsoever they saw fit; there was no direct obligation on the part of John Carlson to work for the carpenter contractor defendants. * * * He who first offends causes the strike. The cause of a cause is the cause of the effect. Remedies should be reciprocal. John Carlson should not be permitted to violate his contract with impunity, and when as a result thereof his employer brings pressure upon others, which indirectly throws John Carlson out of employment for the purpose of making John Carlson live up to his contract, it certainly is just, reasonable and fair that John Carlson should not be permitted

to take advantage of a condition, effect or consequences to him, of which he is one of the inducing causes, if not the primary cause. In such case the law should leave the parties where it finds them, giving no relief and no countenance to a claim for damages.''

Counsel for defendants adopt this theory of the trial court in a proposition of law stated in their brief as follows:

''Plaintiff's right of recovery rests upon the justice and conscience of his case, and is in the nature of a bill in equity. Being a member of the combination which created the condition under which he was injured, he cannot recover.''

A number of cases are cited in support of this contention which hold that the action of trespass on the case ''is based upon the mere justice and conscience of the case, and is in the nature of a bill in equity.'' 21 Encyclopædia of Pleading and Practice 903; *City of Chicago v. Babcock,* 143 Ill. 358; *Comstock v. Johnson,* 46 N. Y. 615. Defendants urge that the action of the union carpenters in refusing to keep their contract to work for 80 cents an hour was illegal, citing *Beekman v. Marsters,* 195 Mass. 205, 80 N. E. 817, and point out, as showing intentional wrong on the part of the carpenters, a resolution passed by the Carpenters' Union to the effect that ''any contractor or owner who will pay one dollar per hour be allowed to proceed with his work, without molestation.''

In the first place, we doubt whether John Carlson was in any way bound by the terms of the supposed contract. The agreement purports to be made between the Carpenters Contractors' Association of Chicago and the Carpenters' District Council of Chicago, Cook county and vicinity. It provides there shall be no strikes, lockout or stoppage of work without the sanction of the joint conference board; that the parties will by all lawful means compel their mem-

bers to comply with the arbitration agreement and working rules, as jointly agreed upon and adopted, and that where members refuse to do so, they shall be suspended from membership in the association or union to which they belong; that no member of the Carpenters' District Council shall be deprived of his right as an individual to refuse to work in immediate conjunction with anyone in his own trade or in any construction work which is not proceeding in accordance with the terms of the joint arbitration agreement and working rules mutually agreed upon in the trade, and with the terms of the joint agreement in force between the members of the Employers' Association; that workmen are at liberty to work for whomsoever they see fit, but they shall demand and receive the wages agreed upon by the joint board; and that employers are at liberty to employ and discharge whomsoever they see fit. Other sections provide for rules of procedure in case of difficulties and for the collection of penalties, suspensions, etc. It would seem, therefore, that by the terms of this supposed contract John Carlson was not obligated to work for any of the defendants at any particular time or at any particular price, or on any terms whatsoever. As a matter of fact, it does not appear that he engaged in the strike at any time or had anything whatsoever to do with it. If we assume that the contract is a valid one, the most that can be said is that John Carlson was a member of a union which was affiliated with the Carpenters' District Council, whose members struck without the sanction of the joint conference board, contrary to the agreement of the District Council with the Contractors' Association. Whether the officers of the labor organizations did all that they were able to do to prevent the men quitting work may well be doubted. But in so far as the building materials corporations and their officers are concerned, this is beside the point. Neither John Carlson nor

the union to which he belonged had any contractual relations with those defendants. But beyond this, we think the contention of the defendants is unsound, as being contrary to the maxim that one wrong does not right another.

It is a novel theory that in an action at law for tort, the defendant may plead in justification the violation of the terms of a contract on the part of the plaintiff. Even the failure to pay a promissory note does not give to the holder of the note the right to assault the defaulting debtor, nor is the defendant in an action of tort allowed to plead in justification the commission of another distinct tort against defendant by the plaintiff. Even the statutes which provide for offsets do not permit one cause of action in tort to be set off against another in the same suit.

As counsel for plaintiff pointed out, in the numerous cases in equity in which an injunction for unlawful picketing, etc., has been granted, it has never, thus far, been held that the grievances which defendants may have sustained at the hands of complainants could be set up to defeat the cause of action alleged in the complainant's bill. Whether in equity such plea may be considered under the maxim that he who seeks equity must do equity, might be an interesting question; but we are aware of no legal principle upon which such a defense may be interposed to an action at law of the sort which is alleged here. To admit such a defense would encourage each person who might think himself wronged to take the law into his own hands whenever he might hazard a guess that the sum total of his grievances had reached such proportions as to justify the tort he was about to inflict.

We conclude, therefore, that the grounds on which the trial court distinguished the case of John Carlson from that of Oscar Carlson are not sound in law, even if we assume facts in the record on which such

a distinction could be justly based. The cases of John Carlson and Oscar Carlson must therefore, we think, stand or fall together.

But the defendants say that neither John nor Oscar is entitled to recover. The briefs disclose a conflict in the views of counsel for the respective parties as to the rule of law by which this question should be determined. The defendants say that the correct test by which to determine such liability, if any, is the primary purpose actuating the defendants.

Plaintiffs, on the other hand, contend that the correct test is not whether the "primary purpose" of the defendants was good or bad; not whether there was "legal justification" for their action; not whether there was "malice." But they say that the correct test lies in the determination of whether the act was done within the doer's own field of fundamental rights in constructively building up his own business, or whether it has an attack upon another, directly invading his field of rights and injuring him.

In 18 Harvard Law Review, pp. 411 and 412, Professor Ames, in opposition to dicta of Lord Watson and Lord MacNaughten as expressed in *Allen v. Flood,* L. R. 1 App. Cas. 1, states the true rule to be:

"The wilful causing of damage to another by a positive act, whether by one man alone or by several acting in concert, and whether by direct action against him or indirectly, by inducing a third person to exercise a lawful right, is a tort, unless there was just cause for inflicting the damage, and the question of whether there was or was not just cause will depend in many cases, but not in all, upon the motive of the actor."

The legal theory upon which the trial court proceeded is not free from doubt. At defendants' request the court held as a proposition of law that the question of whether the primary purpose of defendants in refusing or agreeing to refuse to sell material was malicious (that is, one without justifiable excuse)

was one of fact to be determined from all the evidence in the case; that the court should first decide the question of fact as to what was the primary or ultimate purpose of defendants in refusing to sell materials to plaintiff, and that if the court should find from the evidence that the defendants refused to sell materials to the plaintiff for the primary or ultimate purpose of protecting their business or of conserving and advancing their business interests, and not for the primary purpose of injuring plaintiff, or limiting production for the purpose of stifling competition or creating a monopoly, then defendants were not liable to plaintiff simply because the court might further believe that no competitive relationship existed between plaintiff and defendants.

While, on the other hand, if the court should find from the evidence that the defendants had the primary purpose to injure the plaintiff, then defendants could not escape liability because the court might further find that a competitive relationship in fact existed between plaintiff and defendants or some of them.

The court also marked ''Refused'' the following finding of fact submitted by the defendants:

''The court finds from the evidence in this case that the primary purpose and ultimate object of the materialmen in refusing to sell material was neither to maliciously injure the plaintiff nor to stifle competition or create a monopoly.''

From the above holdings the trial court apparently adopted the theory of the defendants as to the law applicable; that is, the theory that the true test of liability was the primary or ultimate purposes of the defendants.

On the other hand, however, the court marked ''Refused'' propositions of law specifically holding that such was the law. Thus, the defendants ask the court to hold as a proposition of law that:

''The burden rests upon the plaintiff in this case

to prove by a preponderance of evidence that the primary purpose of defendants in refusing to sell material to plaintiff was (a) to maliciously injure the business of plaintiff, or (b) to limit the production or sale of material for the purpose of stifling competition or to create a monopoly."

The court likewise marked "Refused" the request on the part of the defendants to hold as a proposition of law that:

"If the court finds from the evidence that the primary purpose of defendants in refusing to sell material to the plaintiff, Oscar Carlson, was to protect or conserve and advance their own business, and was not to limit the amount and quantity of material sold for the purpose of stifling competition or creating a monopoly, then the defendants are not liable because such action on their part may have incidentally injured the plaintiff."

Likewise the court marked "Refused" the proposition that:

"The court holds as a proposition of law that defendants had a legal right to refuse to sell material to plaintiff unless their primary purpose or ultimate object in so doing was (a) to maliciously injure the business of plaintiff, or (b) to limit and fix the amount and quantity of material sold for the purpose of stifling competition or creating a monopoly."

The defendants say that the "ultimate purpose" (this term is used by them as the equivalent of "primary purpose") of the defendant contractors was to resist the demands of the striking unions, to eliminate jurisdictional and sympathetic strikes and their consequent burdens, to eliminate extortion by business agents, and to induce organized labor to abide by its written contracts and, finally, to render the industry more certain and stable by removing its burdens. They say that the ultimate purpose of the materialmen, and the reason they refused to sell material, was to render the industry more certain and stable by removing these burdens.

The defendants further say that every conscious act of a rational human being is divisible into three elements: first, the motive; second, the purpose; and third, the act itself; that purpose, like motive, may be single and simple, or it may be complex and plural; that a given act may result from a combination of plural motives and plural purposes, and that a purpose may also be alternative or be conditional.

Counsel asks: "What then is meant by primary purpose?" And answers: Obviously what the name implies,—chief, principal, first in importance; and even this primary purpose may be multiple, as it is said it was here with the contractors, or single, as it claimed it was here in the case of the materialmen, viz., to render their own business more certain and stable.

In many of the decisions cited the courts have distinguished between primary and secondary purpose, but neither in these decisions nor in the argument of counsel nor in the law dictionaries do we find that the phrase "primary purpose" has been judicially defined. The words chief, principal, first importance, may well be taken to convey and express the meaning of the word "primary," but these only in part define the meaning of the phrase. To get at that it is necessary to ascertain also the meaning of the word "purpose." That word as used in this phrase and in this connection is a noun. It is defined by Webster as: "That which one sets before himself as an object to be attained; the end or aim to be kept in view in any plan, measure, exercise or operation; design; intention." The Century Dictionary defines the word to mean "anything proposed or intended; an object to be kept in view or subserve in any operation or course of action under the proposed aim." The word is derived from Latin words, which literally mean to place in a position; and as used here is intended to refer to a particular state of the individual will at a particular

time. In other words, it is akin to intention, and we think that the phrase "primary purpose" as used in this connection may properly be held to mean the principal or fixed intention with which an act or course of conduct is undertaken, and within this meaning the "primary" as distinguished from the "secondary" purpose with which the defendants entered upon the plan then in contemplation, included any one of a number of things—not only the ultimate end to be accomplished, but also the acts which, according to the plan in the minds of those who agreed upon it, would be put into effect in order to obtain and realize the ultimate aim.

The defendants had the intention and the purpose, by the use of peaceful but, notwithstanding, powerful means, to compel the striking carpenters to accept less than one dollar an hour for their work. That was the primary and ultimate object of their plan. They also had in mind the purpose and intention to take the preliminary steps which would bring about that result.

Mr. Craig, the principal witness for the defense, and whose office as secretary of the Contractors' Association gives weight to his testimony, says: "The materialmen in refusing to thus sell, acted in combination with each other and with the contractors to attain the immediate common object of making it impossible for the striking unions to secure employment which they otherwise would have secured."

The steps by which this object was to be obtained ultimately were, first, to form a combination which would prevent the sale of all building materials, and thus injure if not destroy the business of all independent builders; and second, to prevent employment of any carpenters, thus taking from them their means of livelihood, compelling them to accept a lower rate of wages. All these purposes were included in and a part of the original plan, to effect which the combina-

tion was devised, and to which, in order that it might be accomplished, the individual wills of the defendants were surrendered to those whose particular work it was to bring about these results.

Each one of the defendants must, we think, be held to have intended all things which were the natural and probable results of the causes which they set in motion. Primary purpose does not, we think, differ materially from primary intention, and every responsible human being is presumed to intend the thing which is the natural and probable result of his acts. In law, intention is not determined by what any given individual or individuals may say was the subjective condition of their wills at a particular time; but rather is conclusively presumed from objective realties which the particular state of mind has brought about. These defendants may have hoped to put an end to graft and other wrongs which from this record, without contradiction, it appears existed; but no one can read this entire record, including the negotiations which led up to the strike and to the lockout and continued until its close, without being forced to the conclusion that no one of these wrongs was the real cause of the controversy. It was not begun because of any one of these matters, and its settlement was not delayed for any such cause. The struggle was in its last anaylsis purely and simply over a question of wages. The carpenters tried to get one dollar an hour for their services; the contractors desired to obtain their services for less compensation. This was the nub of the controversy. Who was in the right it is not necessary for us to decide. It may be that from a moral standpoint the striking carpenters should have submitted the question to arbitration, but it does not appear that there was any legal duty upon, or power in, any one of these plaintiffs to compel them to do so.

While engaged in this industrial battle, the high-

est obligation of each and all was to obey the law of the land. That law allowed the carpenters to strike; it allowed the contractors to lock out the carpenters; but it did not allow either party to the controversy to break the law. We think that the purpose of the defendants was wrongful and in violation of the law. Having so concluded it will be unnecessary to discuss the many cases cited by the defendants tending to uphold the test which defendants contend should be applied.

"Now, intentionally to do that which is calculated in the ordinary course of events to damage, and which does, in fact, damage another in that other person's property or trade, is actionable, if done without just cause or excuse. Such intentional action, when done without just cause or excuse, is what the law calls a malicious wrong." Lord Bowen in *Mogul S. S. Co. v. McGregor*, L. R. 23 Q. B. Div. 598, p. 613.

In *Doremus v. Hennessy*, 176 Ill. 608, the court in holding the defendants liable, said:

"Malice, as here used, does not merely mean an intent to harm, but means an intent to do wrongful harm and injury. An intent to do a wrongful harm and injury is unlawful, and if a wrongful act is done to the detriment of the right of another, it is malicious, and an act maliciously done with the intent and purpose of injuring another is not lawful competition."

We have not cited authorities to any great extent because it is conceded that there are in our own State no cases which may not in some respects be distinguished from these. But the defendants contend that in two cases, *Cote v. Murphy*, 159 Pa. St. 420, and *Buchanan v. Kerr*, 159 Pa. St. 433, it has been expressly held that contractors and materialmen may combine to resist the demands of striking carpenters to obtain higher wages, and that neither the materialmen nor the contractors are in such case liable for refusing to sell to independent contractors or to others. For several reasons we do not regard these cases

as controlling here. In the first place, because we think the positive provisions of the statute, as well as the necessary inferences to be deduced from well-considered cases in our courts, preclude us from giving to these decisions the force of law; and also because we think the opinions there expressed were not necessary to the decisions. It is the conceded law that in actions based upon conspiracy the plaintiff may not succeed where the element of real damage is absent. That element was absent in those cases, and therefore by the weight of authority the action could not be sustained.

That point having been determined, the further matter considered was not necessary to a decision. Indeed, as to the dicta there expressed, these cases have not met with approval generally and, it would seem, have not since been followed by the courts in which they were declared. *Erdman v. Mitchell,* 207 Pa. St. 79; *Bausbach v. Reiff,* 244 Pa. 559.

The conclusion we have reached, that the court was justified in finding that the primary purpose of the defendants was to directly injure John Carlson and indirectly injure Oscar Carlson, has made it unnecessary for us to discuss the numerous points urged by the respective parties and the long line of cases cited in support of their respective contentions. Among these are a number of cases cited by the defendants to sustain their theory that as the individual dealers in materials had a right to sell or not to sell to whomsoever they might please, it was lawful for them to do in combination that which each might do separately. While this is held to be the law of some States, we do not understand it to be generally so held. In a note to *Auburn Draying Co. v. Wardell,* 227 N. Y. 1, 6 A. L. R. 912, it is said:

"The great preponderance of opinion is, however, that the unlawful means which will render a combination to do an act by such means a conspiracy are not

necessarily such as would be wrongful if employed by a single individual, but that the mere force of numbers may create a difference, not only of degree, but also of kind."

Indeed, if any other rule were to be adopted, it would seem as if the law of conspiracy as hitherto interpreted by the courts is at an end.

Defendants have relied very much upon *Kemp v. Division No. 241, supra.* That case was decided by a divided court. The prevailing opinion was by Mr. Justice Cooke, and two other judges concurred therein. One other, Mr. Justice Carter, concurred specially, refusing to be bound by the reasoning of the opinion. Three judges dissented, saying:

"We do not understand that the views of three justices as expressed in the opinion of Mr. Justice Cooke, or our own opinion as to the legal questions involved in this case, establishes the law of this State, but that the concurrence of a fourth justice in the conclusion that the judgment of the Appellate Court shall be reversed and the decree of the Circuit Court affirmed disposes of this case."

In view of this statement we have hesitated to accept the legal propositions stated in the prevailing opinion as settled law, but we are able to gather from reading all the opinions filed in that case that this particular proposition for which defendants contend is contrary to the views of the majority of the Supreme Court as at that time constituted. The opinion by Mr. Justice Cooke states:

"Ordinarily it is true that what one individual may rightfully do, he may do in combination with others. In some jurisdictions the question of the purpose or motive in such cases as this is not inquired into. But in other jurisdictions the opposite view is held, for the very apparent reason that acts done by a combination of individuals may be made much more potent and effective than the same acts done by an individual, and we believe the greater weight of authority to be that what one individual may lawfully do, a combina-

tion of individuals has the same right to do, provided they have no unlawful purpose in view."

At page 243, Mr. Justice Carter says:

"Many argue that what one person may lawfully do, any number of persons by concerted action may also lawfully do. As a practical matter this is not always true. 'It is plain that a strike by a combination of persons has a power of coercion which an individual does not have. The result of this greater power of coercion on the part of a combination of individuals is, that what is lawful for an individual is not the test of what is lawful for a combination of individuals.' (*Pickett v. Walsh*, 192 Mass. 572.) One man, it is true, because of his leadership in labor circles, or his large capital, might commit and be liable for the same damage as a body of men, acting in consort."

It thus appears that the proposition for which defendants contend was in the *Kemp* case repudiated by a majority of the court.

There are many other points made by the respective parties and leading authorities of America and Europe are cited in support thereof; but the views already expressed make a consideration of these unnecessary.

Cases of this sort usually involve the determination of the rights of members of different classes in the community,—the employer and capital, the employee and labor. Very frequently in cases of this kind, the plaintiffs and complainants have belonged to the first-named class. The individual members of both these classes are equal before the law. We have in this case followed rules of law announced in *Gompers v. Buck's Stove & Range Co., supra,* of which bitter complaint has often been made by the employee. These rules are now held applicable and applied to the employer.

It has been a real pleasure to examine the cases cited in the very able briefs. The fine thing about

these cases is that they disclose the evident purpose of the courts without discrimination to render unto every man his due.

In this case the judgment of the trial court will be reversed and judgment entered here in favor of the plaintiff below, appellant here, and against the defendants, appellees, in the sum of $396.

*Reversed with judgment here.*

DEVER, P. J., and McSURELY, J., concur.